C. L. NICHOLS AND MILDRED H. NICHOLS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 84901. Filed November 6, 1964.

*T. M. Ingersoll* and *W. R. Mockridge*, for the petitioners.
*David A. Pierce*, for the respondent.

FAY, *Judge:* Respondent determined a deficiency in petitioners' income tax for the year 1955 in the amount of $25,682.62.

---

[1] *Fribourg Navigation Co.*, T.C. Memo. 1962–290.

The sole issue for decision is whether, under the facts and circumstances of this case, petitioner C. L. Nichols was entitled to claim depreciation on various assets used by him in a quarrying and rock-crushing business in 1955, the year he contracted to sell these assets. All other issues raised by the pleadings have been conceded by the petitioners.

### FINDINGS OF FACT

Petitioners, C. L. Nichols and Mildred H. Nichols, are husband and wife residing in Charlotte, Iowa. They filed a joint income tax return for the taxable year 1955 with the district director of internal revenue at Des Moines, Iowa. The wife, Mildred, is a party hereto solely by reason of her having joined in the filing of said joint return; and the term "petitioner" as hereinafter used will refer only to the husband, C. L. Nichols.

Petitioner, both during and for several years prior to the taxable year 1955 here involved, was engaged in the business of quarrying and rock crushing in Clinton County, Iowa. Prior to 1955, he had been associated in such business with a man named George F. Schrader. Their business operations had been conducted initially as a partnership, later for a time through a corporation, and then thereafter again as a partnership. On January 1, 1955, petitioner had acquired Schrader's interest in the assets and operations of the business, by transferring to him certain real estate and cash, the aggregate value of which is not established by the evidence. Thereafter, during the year 1955, petitioner continued to operate said business as a sole proprietorship, under the former trade name of Nichols & Schrader.

The properties which petitioner employed during the year 1955 in his proprietorship business operations consisted principally of: Miscellaneous machinery and equipment, including such items as rock crushers, drills, compressors, shovels, pumps, bulldozers, trucks, and related units; several automobiles and trucks of various kinds; and four parcels of real estate which he owned, including two on which there were rock quarries and farm buildings, one on which there was a combination garage and office building, and one on which there were bulk oil storage facilities. All of said land (together with the quarries and other improvements located thereon) and approximately 85 percent of said machinery and equipment had previously been used in the above-mentioned partnership between petitioner and Schrader. As to several of the depreciable items, the original cost thereof had been fully depreciated for income tax purposes prior to 1955. One of the above automobiles (an Oldsmobile) had been acquired by the partnership in 1954 and was partially depreciated during that year. Another automobile (a Dodge) and a pickup truck (also a Dodge) were acquired by petitioner in 1955.

In addition, petitioner during the year 1955 was a "lessee" under six quarry lease agreements relating to land owned by various other persons on which rock quarries were situated. At least three of these agreements, as hereinafter shown, had been executed by him during the year 1955; and all had been obtained without payment of any "cost" or consideration, other than his agreement to pay specified royalties on the rock he removed, and to perform the other obligations imposed on him thereunder. The dates of these quarry lease agreements, the period for which they were to run, their costs to petitioner, and the amounts of the royalties which petitioner had contracted to pay to the lessors on the rock he removed, were as follows:

| Name of lease | Date of lease | Period of lease | Cost to petitioner | Royalty to be paid lessor |
|---|---|---|---|---|
| | | *Years* | | *Per ton* |
| Fatchett | Aug. 10, 1954 | 5 | None | $0.05 |
| Mackeprang | Feb. 23, 1955 | 5 | None | .05 |
| Ehlers | Mar. 4, 1955 | 5 | None | [1] .05 |
| Shaff | Aug. 18, 1955 | 5 | None | .10 |
| Spain | (2) | (2) | None | (2) |
| Weibel | (2) | (2) | None | (2) |

[1] Plus 100 tons of agricultural limestone per year.
[2] Not established.

The Shaff lease, as to which the rock was of superior quality, contained a specific provision that "Second party [the petitioner] may not sublease this lease without consent of the first parties." All the leases restricted petitioner's rights thereunder to quarrying operations only, and did not permit farming operations.

The two quarries which petitioner owned and the six other quarries which he leased were all located in Clinton County, Iowa. Their juxtaposition was such that they formed an ellipse roughly similar to the borders of Clinton County. The result was that there was no portion of the county which was not relatively accessible from one of these eight quarries. Petitioner operated on each site from time to time by moving his machinery and equipment from one quarry to another, depending on the particular place or location in the county where he had to deliver the rock. Because of the strategic location of these eight quarries, petitioner had lower transportation costs and better access, generally, to potential purchasers in the county than other producers. This competitive advantage gave petitioner a virtual monopoly in the quarrying and rock-crushing business in Clinton County.

On or about December 15, 1955, petitioner was approached by Kenneth R. Farquhar (hereinafter referred to as Farquhar), who expressed an interest in buying most of the assets of petitioner's business. Farquhar at that time either owned or was associated with the operation of businesses or a similar type in another part of Iowa.

Petitioner had not theretofore advertised or offered his own business for sale. In fact, prior to the time he was approached by Farquhar, petitioner had entertained no intention of selling his business or the operating assets used in it. The result of said negotiations with Farquhar was that (1) petitioner offered to sell all the assets of his business, except for the cash, the accounts receivable, and the aforesaid two automobiles and the pickup truck and (2) petitioner offered to assign in connection therewith his interests as "lessee" in the six quarry lease agreements, all for the aggregate price of $240,000. In addition, petitioner agreed to transfer his inventory of crushed rock on hand. The parties thereupon agreed that the value of this inventory of crushed rock was $9,000, thereby making the aggregate offering price for all said properties (other than the said items which petitioner was to retain) the amount of $249,000. Farquhar accepted this offer.

Thereupon, on December 20, 1955, two written contracts of sale were executed, which may be summarized in material part as follows:

One of said contracts of December 20, 1955, was executed by petitioner and his wife (as the "Seller") and by Farquhar and an associate, O. W. Lawrence, in their individual capacities (as the "Buyer"). This contract pertained solely to the two parcels of real estate owned (not leased) by petitioner, on which rock quarries and certain farm buildings were situated. The buyer agreed therein to pay the total sum of $35,000 for said two parcels of real estate as follows: $500 upon execution of the contract (the receipt of which was acknowledged); $2,000 on or before January 4, 1956; $500 on February 1, 1956; and $500 on the first day of each month thereafter until the whole amount of said purchase price of $35,000 was paid in full. Possession of the real estate was to be delivered to the buyer on January 4, 1956; but execution and delivery of warranty deeds therefor were to be deferred until all covenants and agreements of the buyer had been performed.

The other of said two contracts of December 20, 1955, was executed by the petitioner (as the "First Party") and by and in the name of Farquhar Quarries, Inc., an Iowa corporation, by said Farquhar as president, and said Lawrence as secretary (as the "Second Party"). This contract provided in material part that:

> The First Party hereby sells and agrees to convey and transfer and the Second Party agrees to purchase and pay for all of the [remaining two parcels of] real estate [together with the oil storage facilities and the garage-office building located thereon] and all of the machinery, equipment, supplies, inventories, and assets as more particularly hereinafter referred to and described and connected with or forming a part of the business now conducted by the First Party under the name and style of "Nichols & Schrader" * * *

The total price to be paid by the second party was $214,000. The parties specifically agreed that this price was to be allocated to the

real estate and other assets to be transferred under the agreement on the basis of agreed values as follows:

The total aggregate valuation ascribable to all of the machinery, equipment and leaseholds contracted to be sold and described in the contract of sale was in the sum of _____ $195,000

The valuation of the inventory of all stockpiles of road rock on hand was in the sum of_____ 9,000

The agreed values of the two parcels of real estate owned by petitioner, upon which the business building and facilities were situated, were $8,000 and $2,000, respectively, or a total of_____ 10,000

Total of amounts so allocated (being equal to the aggregate sale price) _____ 214,000

The total purchase price of $214,000 was to be paid in installments as follows: $3,000 upon execution of the agreement (the receipt of which was therein acknowledged); $24,500 on January 4, 1956; $3,000 on the first of each month from February through December 1956; and $5,000 on the first of each month from May 1, 1957 (excepting February, March, and April of each year), until the whole of said purchase price of $214,000 was paid in full. As regards the real estate, possession thereof was to be given to the second party on January 4, 1956, but legal title thereto was to remain in the first party until the entire purchase price was paid, at which time warranty deeds were to be executed and delivered. And as regards the machinery and equipment, possession thereof also was to be given to the second party on January 4, 1956, but title to the same was to remain vested with the first party until $186,500, being the entire remaining purchase price, had been paid. At that time a bill of sale was to be executed and delivered. The first party further agreed to assign to the second party on January 4, 1956, all his right, title, and interest as "lessee" in the six above-mentioned quarry lease agreements; and the second party agreed to assume from and after January 4, 1956, payment of the royalty payments to the "lessors" and also performance of all other obligations called for in said lease agreements.

Two weeks thereafter on the agreed closing date of January 4, 1956, petitioner, Farquhar, and Lawrence met again, and on that date the following events occurred.

(1) As regards the first-mentioned contract of December 20, 1955, relating to the two parcels of real estate owned by petitioner, upon which rock quarries and farm buildings were situated, this contract was made effective without any change of provisions. Possession of these properties was given to the named buyers. Thereupon they paid petitioner the agreed further installment of $2,000 on the total

agreed purchase price of $35,000 (which was in addition to the $500 they had paid at the time of execution of this contract).

(2) As regards the second contract of December 20, 1955, relating to the two remaining parcels of real estate (on which the oil storage facilities and garage-office building were situated), the machinery and equipment, and the leases, Farquhar and Lawrence requested, and petitioner agreed, that a new contract of sale be substituted. This new contract was substantially identical with the other, except for two changes. These changes embodied in the substituted contract were as follows:

(a) In the substituted agreement, the name of the second party was changed from Farquhar Quarries, Inc., an Iowa corporation, to Quarries, Inc., an Indiana corporation which was authorized to operate in the State of Iowa. In the case of both corporations, Farquhar was president and Lawrence was secretary.

(b) In the substituted contract, the description of those properties (other than real estate) as to which an agreed value of $195,000 was assigned for the purpose of allocating the sale price thereto was changed so that any reference to the six quarry lease agreements was omitted (in order to permit assignment of petitioner's "lessee" interests therein to be covered by a separate agreement, as hereinafter shown); and the revised comparable provision of the substituted contract thus read as follows:

> The total aggregate valuation ascribable to all of the machinery, equipment [contracted to be sold and described in the contract of sale] * * * is in the sum of___ $195,000

Petitioner gave credit to the substituted second party, Quarries, Inc., for the $3,000 initial payment which had theretofore been made on December 20, 1955. Quarries, Inc., thereupon paid petitioner the additional amount of $24,500 (making a total of $27,500 for the initial payments under the substituted contract). Also, possession of the properties covered by this contract was thereupon given to the second party, subject to reservation of title in petitioner pending full payment of the purchase price of $214,000.

(3) Concurrently with the closing of the two above-mentioned agreements, another agreement was executed by petitioner and by Farquhar and Lawrence, individually, under which petitioner, "in consideration of the mutual agreements herein made and in consideration of the sum of ONE DOLLAR," assigned to Farquhar and Lawrence in their individual capacities, all his right, title, and interest as "lessee" in the six above-mentioned quarry lease agreements. Farquhar and Lawrence at the same time agreed to assume all obligations under said leasehold agreements, including the payments of the

royalties therein provided for. They further agreed (a) that they would not assign any of said quarry leases without the written consent of petitioner and (b) that in the event of any default of any of the payments or convenants of the previously mentioned contract between petitioner and Quarries, Inc., they would reassign said leaseholds to petitioner, and all of their rights in said leases would revert to petitioner without further action on his part.

(4) Petitioner, as above stated, did not sell, but retained for himself, the following assets of his proprietorship: The cash, the accounts receivable, the Oldsmobile and Dodge cars, and a Dodge pickup truck.

Petitioner, on the joint income tax return which he and his wife filed for the year 1955, claimed a deduction for depreciation for said year of $46,694.15, consisting of depreciation of $45,197.18 on the machinery and equipment he had contracted to sell during 1955 and depreciation of $1,496.97 on the three automotive vehicles which he had elected to retain. In computing such claimed depreciation, petitioner did not provide for, or take into consideration, any salvage value for any of the assets, but rather he proceeded on the theory that all of the assets would be used in his business until their usefulness would be exhausted and they would have no substantial salvage value. The manner in which he computed his claimed depreciation for 1955 was as follows:

| Asset | Date acquired | Original cost | Depreciation allowed in prior years | Remaining adjusted cost basis on Jan. 1, 1955 [1] | Depreciation claimed for year 1955 |
|---|---|---|---|---|---|
| *Sold* | | | | | |
| Machinery and equipment | 1955 | $27,889.55 | none | }$145,993.94 | $44,562.06 |
| Do | Pre-1955 | 161,335.62 | $43,231.23 | | |
| Farm buildings | Pre-1955 | 581.32 | 118.61 | 462.71 | 46.26 |
| Garage and office building | Pre-1955 | 4,775.56 | 1,024.44 | 3,751.12 | 375.11 |
| Oil storage facilities | 1949 | 1,327.50 | 472.50 | 855.00 | 213.75 |
| Total for sold assets | | | | 151,062.77 | 45,197.18 |
| *Retained* | | | | | |
| Oldsmobile car | 1954 | 2,109.58 | 140.62 | 1,968.96 | 656.65 |
| Dodge car and pickup truck | 1955 | 5,041.95 | none | 5,041.95 | 840.32 |
| Total for retained assets | | | | 7,010.91 | 1,496.97 |
| Total for both sold and retained assets | | | | 158,073.68 | 46,694.15 |

[1] Said remaining adjusted cost basis on which the deduction for depreciation was claimed for 1955 is, for the most part, a basis which petitioner carried over from the preceding partnership; and the use of the same was explained by petitioner on reply brief, as follows:

there had been a change in the ownership of the operating business [as of Jan. 1, 1955] but the business itself did not change. Thus under accepted principles of partnership accounting, petitioner was entitled to continue to depreciate the business assets in accordance with the basis, prior years' depreciation and useful lives of such assets carried forward from the partnership years. This is not questioned by respondent * * *

In the absence of any challenge by respondent—and the absence of any evidence as to the manner in which the partnership was terminated, and as to the value of the total consideration in real estate and cash paid to the former partner Schrader for his interests—we have, for present purposes, accepted the remaining adjusted cost basis so used by petitioner.

The following is an itemized list of the depreciable machinery and equipment sold by petitioner on January 4, 1956. It sets forth pertinent facts relating to the depreciation claimed on these assets.

| Type of property | Original cost or basis | Depreciation claimed prior to Jan. 1, 1955 | Adjusted basis as of Jan. 1, 1955, or at time acquired during 1955 | Depreciation claimed in 1955 | Estimated remaining useful life as of Dec. 31, 1955 (years) |
|---|---|---|---|---|---|
| Primary crusher | $15,744.90 | $1,718.75 | $14,026.15 | $3,747.45 | 3 |
| Secondary crusher | 16,742.05 | 823.38 | 15,918.67 | 3,979.67 | 3 |
| GMC twin 6 power unit | 9,549.20 | 2,782.94 | 6,766.26 | 2,259.79 | 2 |
| Koehring shovel | 14,437.50 | 6,562.50 | 7,875.00 | 3,937.50 | 1 |
| Bucyrus-Erie ¾ yd. shovel | 16,358.10 | 4,755.90 | 11,602.20 | 4,640.88 | 1½ |
| Dragline bucket and attachment | 1,986.26 | 283.74 | 1,702.52 | 567.21 | 2 |
| A.C. Mod. HD 15A dozer | 16,777.04 | 2,396.72 | 14,380.32 | 4,795.83 | 2 |
| Koehring dumpsters (2) | 18,215.66 | 5,288.43 | 12,927.23 | 6,463.62 | 1 |
| Portable bins (3) | 8,359.21 | 1,156.80 | 7,202.41 | 1,244.83 | 4-7 |
| Sanderson well drill | 7,220.44 | 3,281.98 | 3,938.46 | 1,312.80 | 2 |
| Air compressor | 5,207.34 | 3,352.66 | 1,854.68 | 927.34 | 1 |
| Truck scales (8) | 13,369.13 | 1,185.40 | 12,183.73 | 2,051.60 | 2-4 |
| Caterpillar dozer | 5,508.98 | 4,382.68 | 1,126.30 | 813.15 | ½ |
| International truck tractor | 7,129.17 | 1,320.21 | 5,808.96 | 2,904.48 | 1 |
| Tanks | 1,235.95 | 215.83 | 1,020.12 | 123.07 | 2-9 |
| 1953 Dodge pickup truck | 1,108.34 | 291.67 | 816.67 | 408.34 | 1 |
| 1953 Ford pickup truck | 798.07 | 208.97 | 589.10 | 294.55 | 1 |
| 1955 Dodge pickup truck (w/toolbox) | 2,358.79 | ----------- | 2,358.79 | 393.13 | 2 |
| 1955 Dodge pickup truck | 1,777.38 | ----------- | 1,777.38 | 296.23 | 2 |
| Rock breaker | 479.52 | 88.38 | 391.14 | 39.11 | 9 |
| Trailer lowboy | 2,080.33 | 1,580.33 | 500.00 | 250.00 | 1 |
| Trailer | 372.71 | 113.44 | 259.27 | 51.86 | 4 |
| Dodge dump truck | 3,760.19 | 274.60 | 3,485.59 | 1,162.45 | 2 |
| Michigan loader | 15,167.47 | ----------- | 15,167.47 | 1,516.75 | 4 |
| Ford industrial engine | 668.95 | ----------- | 668.95 | 66.90 | 4 |
| Pump | 737.55 | 603.45 | 134.10 | 67.05 | 1 |
| Desk and chairs | 59.45 | 19.41 | 40.04 | 8.01 | 4 |
| Calculator (used) | 28.84 | 21.16 | 7.68 | 7.68 | ----------- |
| Check protector | 61.49 | 13.49 | 48.00 | 7.99 | 5 |
| Typewriter (used) | 38.50 | 21.50 | 17.00 | 17.00 | ----------- |
| Safe | 190.28 | 18.72 | 171.56 | 10.72 | 15 |
| Adding machine | 141.19 | 30.82 | 110.37 | 18.39 | 5 |
| 2 Fireproof files | 523.26 | ----------- | 523.26 | 17.54 | 14 |
| Grease machine | 235.15 | 146.15 | 89.00 | 44.52 | 1 |
| Filling station equipment | 302.60 | 112.40 | 190.20 | 47.55 | 3 |
| Air compressor | 212.40 | 75.60 | 136.80 | 28.36 | 4 |
| Steam cleaner | 183.34 | 66.66 | 116.68 | 23.34 | 4 |
| Scale house | 98.44 | 36.56 | 61.88 | 15.47 | 3 |

Respondent, pursuant to statutory notice of deficiency, disallowed all of the depreciation claimed by petitioner with respect to the machinery and equipment which petitioner had contracted to sell on December 20, 1955, and actually did sell 2 weeks later on January 4, 1956. Respondent in the notice of deficiency gave the following explanation for his action:

Depreciation deduction claimed on the return is decreased in the amount of $45,929.15. Some of the assets were contracted to be sold as of January 4, 1956 during the year 1955. In 1955 the sale price was known and such sale price exceeded the remaining cost basis on January 1, 1955 or date of acquiral during 1955.

With regard to the other business assets which petitioner retained, respondent reduced the amount of depreciation claimed by redetermining the amount of depreciation to be allowed. The aggregate amount of allowable depreciation for all the assets retained by peti-

tioner as recomputed by respondent was $765. Respondent arrived at this amount by taking into consideration "Estimated Salvage Value," as determined by him, in the amount of $1,218.96 for the Oldsmobile automobile, $1,311.95 for the Dodge automobile, and $640 for the Dodge pickup truck.

## OPINION

It is respondent's position that, as a matter of law, no depreciation is allowable with respect to the machinery and equipment contracted to be sold by petitioner in 1955 because petitioner knew, before the end of that year, that the amount to be received for such assets exceeded his aggregate adjusted basis therein as of January 1, 1955, or their date of acquisition during 1955. This Court in a very recent opinion, *Macabe Co.*, 42 T.C. 1105 (1964), held that there is no such rule of law. See also *Smith Leasing Co.*, 43 T.C. 37 (1964); and *Harry Trotz*, 43 T.C. 127 (1964).

Despite the fact that we cannot sustain respondent as a matter of law, the determination made in his statutory notice of deficiency is presumptively correct. As we indicated in *Macabe Co.*, *supra* at 1115, the amount received upon the sale of property at or near the end of its estimated useful life (especially in the case of property with a short useful life) may be a relevant yardstick for purposes of determining salvage value. Thus, where respondent, pursuant to a statutory notice of deficiency, disallows a depreciation deduction in the year of sale because the sales price exceeds the estimate of salvage value, respondent has made a prima facie case that excessive depreciation has been claimed and that no depreciation is allowable in the year of sale. At that point, petitioner, in order to establish that he is entitled to some or all of the depreciation claimed, must show that estimates used by him in his depreciation schedule were correct and that the gain realized on the sale resulted from market appreciation. Our holding that depreciation cannot be disallowed as a matter of law solely because the sales proceeds exceed the adjusted basis of the asset as of the beginning of the year does not detract from the presumptive correctness of respondent's disallowance of depreciation. This is not a situation where respondent's determination loses its presumption of correctness because it was arbitrarily made or is plainly wrong. Cf. *Helvering* v. *Taylor*, 293 U.S. 507 (1935); and *Welch* v. *Commissioner*, 297 F. 2d 309 (C.A. 4, 1961), reversing a Memorandum Opinion of this Court. The instant case involves a situation where petitioner is claiming a deduction. The burden is therefore on petitioner not only to show that the respondent's determination was incorrect but also to establish the amount of the deduction claimed. *Burnet* v. *Houston*, 283 U.S. 223 (1931). *To the extent* petitioner can establish that he

is entitled to the deduction claimed, we will allow such deduction. *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930). To the extent petitioner cannot demonstrate that he is entitled to the depreciation claimed, we must sustain respondent's determination.

A review of the record before us indicates that petitioner has carried his burden as to the major portion of the depreciation claimed by him.

Petitioner claimed depreciation on the assets sold on the basis of the straight-line method of depreciation. Various useful lives had been assigned to the assets. As of December 31, 1955, the assets had remaining useful lives ranging from zero to 4 years, with only a few exceptions. In each instance the estimate of useful life was based upon petitioner's intention to hold the asset for its full physical life. Respondent does not dispute the correctness of any of these estimates of useful life. It is true that petitioner contracted to sell the major portion of the operating assets used in his business within 1 year after he bought out his partner and began to conduct the rock-crushing and rock-quarrying business as a sole proprietorship. However, respondent in the present situation does not regard petitioner's sale as evidence that petitioner, at the time he acquired his partner's interest in the business, intended to sell the business and the underlying assets within 1 year's time. Cf. *Smith Leasing Co.*, *supra*. On the basis of the record before us, petitioner, as of the beginning of 1955, or at such times during 1955 when he acquired additional assets for use in his business, did not anticipate selling such assets prior to the expiration of the various estimates of useful life he had made with regard thereto.

In computing depreciation on these assets, however, petitioner had neglected to take any salvage value into consideration. It was conceded on behalf of petitioner that the assets in question, at the end of their estimated useful lives, would have had some salvage value. Because of this fact, petitioner over the years may have claimed more depreciation than he was entitled to.

However, in our view, petitioner has demonstrated that the major portion of the gain realized by him on his sale was not an artificial or pseudo gain resulting from excessive depreciation (the claiming of depreciation at a faster rate than actual exhaustion was taking place) on the equipment sold.

We have previously found that on December 20, 1955, petitioner entered into two contracts relating to the sale of his business. Pursuant to the first, he agreed to sell for an aggregate consideration of $35,000 two pieces of real estate owned by him on which rock quarries and farm buildings were located. Pursuant to the second contract, petitioner agreed to sell, for an aggregate consideration of $214,000, the major portion of his machinery and equipment, the leases, his inventory of crushed rock, and two additional pieces of real estate on

which the premises of his business were located. That contract allocated to the machinery and equipment and the leaseholds the sum of $195,000 of the $214,000 agreed to be paid. For reasons we can only speculate upon, 2 weeks later the purchasers, Farquhar and Lawrence, requested petitioner to execute a new contract. This contract was to differ from the original contract in that the entire $195,000 to be paid by the purchasers was to be allocated solely to the machinery and equipment, rather than to the machinery and equipment and the leases, as was provided in the original contract. The leases were to be transferred to Farquhar and Lawrence, in their individual capacities, pursuant to a separate agreement for a consideration of one dollar.[1] Petitioner did not believe that these modifications would adversely affect him in any way. Therefore, he agreed to these changes and executed the new agreement. Since respondent was not a party to any of these agreements, petitioner could properly introduce parol evidence with regard to the correctness of the allocation made in the second contract. *Haverty Realty & Investment Company*, 3 T.C. 161, 167 (1944).

Petitioner has offered expert testimony as to the fair market value of the machinery and equipment as of December 31, 1955. Although this testimony does not erase every doubt from our mind concerning the fair market value of the property as of the above date, we believe that it is generally creditable and that it is sufficient to establish that as of December 31, 1955, the machinery and equipment did not have a value in excess of approximately $116,000. Petitioner would then have us hold that the remaining $79,000 of the sale price ($195,000 less $116,000) represented consideration for the six quarry lease agreements. There is no evidence before us that petitioner's interest as "lessee" in any one of the six quarry leases in and of itself had any substantial value. Moreover, it is reasonable that petitioner was, pursuant to the royalty payments called for in each particular lease, paying the fair market value for the rights to quarry that he received under each lease. There is, however, evidence in the record tending to establish (1) that because of the number and location of the quarries used by petitioner (the two he owned and the six he leased), he had certain competitive advantages over other producers in Clinton County (primarily lower transportation costs, better access to consumers, etc.) which gave him a virtual monopoly in the area, and (2) that this competitive advantage was valuable. However, on the basis of the record before us, we are unable to ascribe the entire $79,000 excess of the sales price over the value of the machinery and equipment to this one factor alone. For it is possible that part of this

---

[1] If all of the purchase price were attributed to the machinery and equipment, the purchasers would have a higher basis for depreciation. Moreover, by taking the leases in their own names, the purchasers may have believed that they would have been able to gain certain tax advantages.

excess might be attributable to goodwill or the "going concern" value of petitioner's business. Moreover, part of the excess might have been a premium attributable to the fact that petitioner sold substantially all of his machinery and equipment as a unit. Although we are unable to make the finding requested by petitioner, nevertheless, we do conclude that on the basis of the record before us no part of the above-mentioned $79,000 realized by petitioner resulted from the claiming of excessive depreciation on the machinery and equipment. Therefore, all of the $79,000 gain should be taxed under the sections of the Internal Revenue Code of 1954 dealing with gains and losses, and no part thereof should be recast into ordinary income through a disallowance of depreciation. See *Macabe Co., supra* at 1110.

However, by this we do not mean to imply that petitioner has established that he is entitled to all of the depreciation on the machinery and equipment claimed by him in 1955. The record indicates that petitioner's aggregate basis in the machinery and equipment contracted to be sold as of the beginning of 1955 or as of the date he acquired them during 1955 was approximately $146,000. The record further indicates that petitioner claimed depreciation thereon for the year 1955 in the aggregate amount of approximately $44,500, leaving an undepreciated basis therein at the end of the year in the aggregate amount of approximately $101,400. We have found, however, that the fair market value of these assets as of December 31, 1955, was approximately $116,000. Petitioner has not introduced, nor does the record contain, any evidence concerning market appreciation in the value of the machinery and equipment (other than in regard to the above-mentioned gain of $79,000). Therefore, petitioner has failed to establish that approximately $14,600 of the gain realized by him in connection with the sale of the machinery and equipment did not result from the claiming of excessive depreciation thereon. To this extent petitioner has failed to overcome the presumptive correctness of respondent's determination in the notice of deficiency. Therefore, we sustain respondent to the extent that we hereby disallow approximately $14,600 of the depreciation claimed by petitioner for the year 1955 on the ground that it is excessive.

Finally, we come to the three items of depreciable property which the petitioner elected to retain, the Oldsmobile car, the Dodge car, and the Dodge pickup truck. In computing the deduction for depreciation on these items, petitioner attributed a 3-year useful life to each. but he did not attribute any salvage value to them. Respondent, in his notice of deficiency, likewise used a 3-year life, but he determined a salvage value for each item and recomputed the depreciation for each in the light of that adjustment. Petitioner has presented no evidence as to the salvage value of these items of automotive equip-

ment at the end of their useful lives of 3 years. Rather, his only evidence as to them was to their fair market value at December 31, 1955, which evidence is not competent to prove salvage value at a date 2 years thereafter. We therefore sustain respondent's determination with regard to the depreciation claimed on these three assets.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

PIERCE, *J.*, dissenting:

I

This is another one of a group of three cases [1]—each involving the allowability of depreciation on property in the year of its sale, where the realizable "salvage value" reflected by the sale price exceeded the unrecovered cost basis of the property—in which this Court has refused to follow three decisions of the Courts of Appeals, notwithstanding that there is no contrary Court of Appeals authority and that one of the decisions affirmed the previous position of this Court.

On July 15, 1964, the Court of Appeals for the Second Circuit, acting through two completely different panels of judges, decided the cases of *Fribourg Navigation Co.* v. *Commissioner*, 335 F. 2d 15, affirming a Memorandum Opinion of this Court; and *United States* v. *Motorlease Corporation*, 334 F. 2d 617, reversing 215 F. Supp. 356 (D. Conn.). In each of these cases said circuit, after considering the controlling statutes, the pertinent income tax regulations, and various conflicting views on the above-mentioned depreciation problem, decided in substance that a taxpayer cannot depreciate property in the year of its sale to a point where the adjusted basis thereof would go below the "salvage value" established by the price for which the property was sold. In these decisions the Second Circuit not only approved the longstanding position of the Internal Revenue Service; but it also approved the position previously taken in 1958 by the Court of Appeals for the Sixth Circuit in *Cohn* v. *United States*, 259 F. 2d 371, which was thereafter followed by this Court not only in the above-mentioned *Fribourg* case (which was affirmed) but also in *Randolph D. Rouse*, 39 T.C. 70 (1962), and in *Edward V. Lane*, 37 T.C. 188 (1961). Subsequent to all these decisions and in the absence of any contrary Court of Appeals authority, the law regarding the above-mentioned depreciation problem appeared to be fairly well settled.

Shortly thereafter however, this Court changed its position; and both in the instant case and in the above-cited *Macabe* and *Trotz*

---

[1] The other two cases are *Macabe Co.*, 42 T.C. 1105 (decided Sept. 29, 1964), and *Harry Trotz*, 43 T.C. 127 (concurrently considered with the instant case).

cases, it not only declined to follow its own above-mentioned precedents but also refused to follow the above-cited decisions of the Second and Sixth Circuits. In the *Macabe* case, in which five judges expressed their dissent, this Court stated in footnote 10 of its opinion: "we do not agree with the rationale employed by the court [i.e., by the Second Circuit in the *Fribourg* and *Motorlease Corporation* cases]." And more recently in both the instant case and in the concurrently considered *Trotz* case, it likewise refused to follow the above-mentioned decisions of the Second and Sixth Circuits by not even considering, distinguishing, or citing any of them, and by instead placing principal reliance on its changed position as expressed in the *Macabe* case.

In my view, such refusal of a trial court to follow the nonconflicting decisions of the Court of Appeals, and also in refusing to follow its own established precedents almost immediately after one of them had been affirmed, leads only to confusion on the part of the bar, and to the encouragement of increased litigation at both the trial and appellate levels. Also within this Court, such action will lead to confusion in the handling of future cases—especially those which may arise within the jurisdictions of the Second and Sixth Circuits where the law has been established contrary to that of this Court's revised position. Certainly in the present fluctuating situation, no lawyer can with assurance advise his client as to what the law is today on the depreciation problem here involved, or as to what it may be tomorrow. (See, in this connection, the dissenting opinion of Judge Simpson in *Steinhort* v. *Commissioner*, 335 F. 2d 496 (C.A. 5, 1964).)

## II

Another unique feature of the Court's opinion herein is that, in determining the "salvage" or resale value of the machinery and equipment which was sold, the Court disregarded the sale price upon which the parties themselves had agreed, and employed instead *opinion-evidence as to fair market value* of the property at the time of its sale. By such process, it approved the use of a fair market value for the machinery and equipment in the amount of $116,000, in lieu of the actual sale price of $195,000—thus making possible the use of one "sale price" for the seller, in computing salvage value for present depreciation purposes; and the use of a different sale price for the buyer, in computing its cost basis for depreciation in future years. The difference between these two amounts ($116,000 and $195,000) is $79,000; and as to this amount, the Court was unable, even by use of conjecture, to identify the same with any of the specifically listed items of property included in the sale agreement for the rock-crushing business involved.

In my view, such use of *fair market value* in lieu of the actual sale price, for determining realizable "salvage value" in the year of sale,

is not warranted. No support or authority for such method can be found either in the pertinent statute or the Income Tax Regulations; and it appears to be completely out of harmony, both with the above-cited Court of Appeals authorities and with the decisions of the Supreme Court in *Massey Motors* v. *United States*, 364 U.S. 92 (1960), and *Hertz Corporation* v. *United States*, 364 U.S. 122 (1960).

Based on all the foregoing, I respectfully express my dissent.

MULRONEY, *J.*, agrees with this dissent.

