Specialty Paper and Board Co., Inc. v. Commissioner.
Specialty Paper & Board Co. v. Commissioner
Docket No. 189-63.
United States Tax Court
T.C. Memo 1965-208; 1965 Tax Ct. Memo LEXIS 122; 24 T.C.M. (CCH) 1085; T.C.M. (RIA) 65208; July 28, 1965
Herbert L. Zuckerman, 60 Park Place, Newark, N.J., for the petitioner. William F. Fallon, for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined a deficiency in petitioner's 1960 income tax of $85,900.11. The parties have settled several issues, and only two questions remain for decision: (a) the value of stock received by petitioner as consideration for the transfer of its business assets and (b) the allowance of a depreciation deduction for certain of those assets in the year of transfer. Findings of Fact Some facts have been stipulated and are found accordingly. *123 Petitioner, a jobber of paperboard products, was a Pennsylvania corporation with its business address at 23rd Street and Washington Avenue, Philadelphia, in 1960. It utilized an accrual method of accounting and filed its Federal income tax returns on the basis of a fiscal year ending October 31. On July 22, 1960, petitioner and one Robert E. Connelly entered an agreement whereby petitioner would convey land, improvements, machinery, equipment, furniture and fixtures located at 23rd Street and Washington Avenue to Robert E. Connelly or his nominee for 87,000 shares of the common stock of Connelly Containers, Inc. Robert E. Connelly was to take the buildings and land subject to a $58,000 mortgage thereon. Two days later petitioner's board of directors adopted a resolution approving the sale. On July 24, Robert E. Connelly assigned his agreement to Connelly Containers, Inc., of Philadelphia (hereinafter sometimes referred to as Philadelphia), a subsidiary of Connelly Containers, Inc. (hereinafter sometimes referred to as Connelly). Both corporations then agreed that Connelly would issue 87,000 shares of its common stock to Philadelphia in exchange for all of Philadelphia's stock *124 and its noninterest bearing demand note for $406,750. The board of directors of each corporation approved the exchange. Connelly's board also passed the following resolution: RESOLVED, That upon approval of its listing application to be filed with American Stock Exchange, this Corporation issued to Specialty Paper and Board Co., Inc., 87,000 shares of its Common Stock. On August 18, 1960, Connelly notified petitioner that, promptly after settlement and issuance of the stock to petitioner, it would proceed to register, at its expense, the 87,000 shares under the Securities Act of 1933. On August 22, 1960, petitioner sent the following letter to Connelly: Gentlemen: This letter will confirm our agreement with reference to the 87,000 shares of Common Stock of Connelly Containers, Inc. to be transferred to us as the purchase price for the real estate, machinery and equipment located at the above premises. It is our intention that all of these shares of stock, when acquired by us, will be held for investment and not with a view to their distribution. Furthermore, we agree that these shares will not be disposed of unless and until they are registered under the Securities Act *125 of 1933, as amended, or unless opinion of counsel has first been obtained to the effect that such registration is not required in respect to such disposition. On September 9, 1960, Connelly applied to the American Stock Exchange for listing of the 87,000 shares. That application contained the following language: For the purpose of the above [Connelly-Philadelphia] transaction, the Common Stock of the Company has been valued at $5.25 per share * * *. The application was approved on September 13, 1960. Pursuant to the July 22nd agreement, petitioner, on September 20, 1960, transferred, subject to the previously mentioned mortgage (now reduced to $57,000), the following assets to Philadelphia: Petitioner's
Adjusted
Original
Book Value
Asset
Cost
10-31-59
Land
0
0 *
Buildings
$282,455.14
$191,219.32
Machinery & Equipment
383,255.60
23,765.01
Furniture & Fixtures
15,001.84
0
Additions to Assets
4,041.53
0
On September 20, the 87,000 shares of Connelly were transferred to petitioner. The stock certificate bore the following legend: The shares represented by *126 this certificate have not been registered under the Securities Act of 1933. The shares have been acquired for investment and may not be pledged or hypothecated and may not be sold or transferred in the absence of an effective registration statement for the shares under the Securities Act of 1933 or an opinion of counsel to the company that registration is not required under said Act. Although Connelly had previously agreed to bear the expense of registration of the shares under the Securities Act of 1933, they had not been registered by September 20, nor had they been registered by the date of the trial of this case. Petitioner's receipt of the Connelly shares was exempt from registration under section 4(1) of the Securities Act of 1933 as a "private placement." Connelly's common stock was held as follows on September 20: The Connelly family
1,823,141 shares
The general public (includ-
ing petitioner's 87,000
shares)
463,659 shares With the exception of petitioner's 87,000 shares, all Connelly common stock had been registered by 1960 under the Securities Act of 1933. All of the shares were registered under the Securities Exchange Act of 1934 and listed on *127 the American Stock Exchange as of September 20, 1960. The shares of Connelly and its predecessors had been traded on the American Stock Exchange since 1945. During the months indicated, the following number of shares of Connelly Containers, Inc., common stock were sold over the American Stock Exchange, the high and low prices in each month being as set forth: 1960
Month
Shares Sold
High
Low
January
2,200
5 7/8
5
February
1,700
5 1/8
4 3/4
March
4,800
5 1/8
4 3/4
April
2,500
5 7/8
4 3/4
May
2,200
5 1/4
4 5/8
June
1,500
4 5/8
4
July 4,200
5 1/4
4 1/4
August
2,900
5 1/4
4 3/4
September
4,600
5 1/4
4 5/8
October
500
5
4 5/8
November
28,800
5
4 1/2
December
11,600
5
4 3/8
1961
January
74,600
4 3/4
4
February
5,400
4 5/8
4
March
5,400
4 5/8
4 1/4
April
6,300
5 1/4
4 5/8
On September 20, 1960, 200 shares of Connelly Containers, Inc., were sold on the American Exchange. The high and low for that day were both 5 1/8. Philadelphia operated the acquired assets through mid-April 1961, at which time it sold the assets to between 15 and 20 purchasers. It received $401,000 from such sales. Connelly's *128 sales and net income in the calendar years 1959, 1960 and 1961 were as follows: Net Income
(per share
Dividends Paid
Shareholder's
Year
Sales
after taxes)
(per share)
Equity
1958
$10,771.261
.15
.10
$2,444,095
1959
11,924.234
.20
.10
2,614.614
1960
12,092,390
.15
.10
3,165,856
1961
11,812,773
.135
.10
3,190,323
In its 1960 Federal income tax return petitioner valued each Connelly share at $1.47. The statutory notice of deficiency issued by respondent placed the value of each share at $5.125. In that same return petitioner claimed a deduction for depreciation in the amount of $27,815.90 on the assets transferred to Connelly. Respondent's notice of deficiency disallowing the deduction stated: The amount of $27,815.90, claimed as a deduction for depreciation on assets sold or exchanged during the taxable year has been disallowed pursuant to the provisions of section 167 of the Internal Revenue Code of 1954, because the amount determined as realized from the sale or exchange of such assets exceeded the adjusted basis of the assets as of the beginning of the taxable year. In computing depreciation *129 deductions for its taxable periods prior to the one here involved petitioner divided the number of years determined to be the useful life of the assets in question in its business into their cost upon acquisition. With the exception of the buildings, petitioner's projected useful lives for the assets transferred had expired on or before September 20, 1960. Petitioner had projected no salvage value for any of these assets. The Connelly shares received by petitioner had an ascertainable fair market value on September 20, 1960. The value of each share on that date was $2.85. Opinion The first issue is the correct value of the Connelly shares on their transfer to petitioner. The prerequisite to a determination of this issue is a finding that the shares had an ascertainable fair market value on that date. If they did not, we need go no further. If they did, we must determine that value. [1]
*130 Petitioner contends that since it could not sell the shares on the date of their receipt, they had no ascertainable market value. In support of this contention, it cites the Securities Act of 1933, 15 U.S.C.A. 77 which forbids the sale of unregistered shares to the public, its agreement to hold the shares for investment, the restrictive covenant imprinted on the certificate, and the speculative nature of the Connelly enterprise. However, if we should determine that the shares did have an ascertainable value on the date in question, it further argues that the blockage principle requires that such value be substantially less than the stock exchange prices for such stock on that day. Respondent answers that the restrictive covenant and the absence of registration under the Securities Act of 1933 [2] did not rob the shares of ascertainable value, since petitioner could have made a private sale thereof. Further, he argues that the stock exchange price of the shares registered under the 1933 Act on the date of the transaction, after subtracting the estimated costs of disposing *131 of the shares, is determinative of the value of the shares in question. We conclude that the value of such shares was ascertainable on September 20, 1960, the date of the transfer. Petitioner cites Tex-Penn Oil Co. v. Commissioner, 83 F. 2d 518 (C.A. 3, 1936), affd. sub nom. Helvering v. Tex-Penn Oil Co., 300 U.S. 481 (1937) and United States v. State Street Trust Co., Executor, 124 F. 2d 948 (C.A. 1, 1942) for the proposition that restriction on sale of shares and the speculative nature of the enterprise represented by such sales results in an unascertainable market value for the shares. However, in those cases there was an absolute restriction on sale; furthermore, Tex-Penn's *132 business was a new venture engaged in drilling oil wells and State Street involved shares (a) of a new business that was the top of a highly pyramided public utility holding system, (b) that were junior to 83 or 84 percent of the stock of the entire system and, correspondingly, thinly covered by the system's earnings. These situations provide a sharp contrast to the facts of the instant case. There was no absolute restriction on the sale of the Connelly shares, although admittedly they were not subject to public sale. We note that petitioner wrote to Connelly on August 22, 1960: It is our intention that * * * these shares * * *, will be held for investment and not with a view to their distribution. Furthermore, we agree that these shares will not be disposed of unless and until they are registered under the Securities Act of 1933, * * * or unless opinion of counsel has first been obtained to the effect that such registration is not required in respect to such disposition. [Emphasis added.] [3]
Thus, unlike Tex-Penn and State Street, petitioner could have disposed of the shares, provided *133 that such disposition did not result in distribution of the shares to the public, see Gilligan, Will & Co. v. Securities Exchange Commission, 267 F. 2d 461, 466 (C.A. 2, 1959) and that it obtained a legal opinion that registration was not required. Victorson v. Commissioner, 326 F. 2d 264 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court. Its statement of intention to hold the shares for investment does not invalidate our conclusion. Edith G. Goldwasser, 47 B.T.A. 445-456 (1942), affd., 142 F. 2d 556 (C.A. 2, 1944), certiorari denied 323 U.S. 765 (1944); Molloy, Restraints on Alienation and the Internal Revenue Code, 7 Tax L. Rev. 439 (1952); Fleischer, Jr. and Meyer, Tax Treatment of Securities Compensation: Problems of Underwriters, 16 Tax L. Rev. 119, 131-133 (1960). While Connelly was not, in stock market parlance, a "blue chip," neither was it in the situation of the enterprises in Tex-Penn and State Street, supra. Inasmuch as the stock of Connelly's predecessor had been traded on the American Stock Exchange since 1945, petitioner did not receive *134 shares of an untried enterprise - as was the situation in Tex-Penn. Furthermore, between 1958 and 1961 Connelly's annual sales approximated $11 to $12 million and stockholders' equity increased by more than $700,000. Although the decrease in net income from.15 to.20 cents per share in 1958 and 1959, respectively to.135 cents per share in 1961 might have resulted in a decrease in the market value of the stock, cf. A. W. Mellon, 36 B.T.A. 977 (1937), such a factor is insufficient to support a finding of no ascertainable market value. This is especially true in light of Connelly's substantial capital expenditures during this period, for a purchaser of shares could reasonably look forward to increased earnings that could be generated by these improvements. Petitioner argues that if it violated its stated intention to hold the shares for investment by making a private placement, it would be subject to penalties prescribed by the Securities Act of 1933: If the petitioner did sell its stock in violation of its private placement agreement, it would have become subject to the liabilities of the Act as a statutory underwriter. * * * Reliance upon the private placement exemption *135 would not be justified, and a sale of stock without a prior registration would be illegal. Its theory is that a clearly public distribution of the shares, absent an unforeseen change in the circumstances of the enterprises represented by the stock, would not be a transaction exempted from SEC registration by section 4(1) of the Act, 43 Stat. 77 (1933), 15 U.S.C. § 77 (d)(1), and that "when viewed in its entirety," any private placement by petitioner would be telescoped into the transaction of September 20, 1960, resulting in a public distribution. While we agree that a clearly public distribution would not be an exempt transaction, it does not necessarily follow that a subsequent private placement would result in a public distribution within the meaning of the Act: Hence, it is prudent for the issuer - or the seller in a control relationship with the issuer who is proceeding on the assumption that his buyers will not be "underwriters" so as to destroy the exemption under the first clause of § 4(1) - to request investment letters from the buyers. More properly, *136 these letters should state negatively, more or less in the language on § 2(1), that the buyers are not taking with a view to distribution; for a promise to hold for investment, or not to resell, would be inconsistent with a private resale for investment, which would not necessarily destroy the exemption. * * * [Loss, 1 Securities Regulation 665 (2d ed. 1961)]. We turn now to the valuation of the Connelly shares on September 20, 1960. Respondent's notice of deficiency placed the value of each share at $5.125, but at trial his expert witness stated that the value was $4.50. Respondent adopted the latter figure in his briefs. After considering stock exchange prices and volume, the company's product and performance, the blockage factor and all other relevant facts (see Gordon, What Is Fair Market Value, 8 Tax L. Rev. 35 (1952)), we have determined the value of each share to be $2.85. The second issue is whether petitioner is entitled to an allowance for depreciation on the assets transferred to Philadelphia in the year of transfer. Respondent disallowed the deduction on the ground that the amount realized on the sale exceeded the adjusted basis thereof at the beginning *137 of the year of sale. Petitioner cites Macabe Co., Inc., 42 T.C. 1105 (1964), on appeal (C.A. 9, Feb. 12, 1965), for the proposition that realization on sale of an amount exceeding adjusted basis does not require disallowance of depreciation in the year of sale. However, Macabe involved assets sold early in their useful life and subsequent cases have reached a different result in different circumstances. In C. L. Nichols, 43 T.C. 135, 143 (1964), (C.A. 8, 1965), we stated: Thus, where respondent, pursuant to a statutory notice of deficiency, disallows a depreciation deduction in the year of sale because the sales price exceeds the estimate of salvage value, respondent has made a prima facie case that excessive depreciation has been claimed and that no depreciation is allowable in the year of sale. At that point, petitioner, in order to establish that he is entitled to some or all of the depreciation claimed, must show that estimates used by him in his depreciation schedule were correct and that the gain realized on the sale resulted from market appreciation. * *138 * * Although petitioner had projected no salvage value for the assets involved, it failed to show that the amount realized on their sale was attributable to market appreciation rather than such value. Engineers Limited Pipeline Company, 44 T.C. 226 (1965). Nor did it show that its estimates of useful life were correct. Bell Lines, Inc., 43 T.C. 358 (1964). Respondent's action regarding issue two is sustained. Decision will be entered under Rule 50. Footnotes
*. When acquired in 1951, no allocation of cost was made to the land.↩
1. SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS. (a) Computation of Gain or Loss. - The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized. (b) Amount Realized. - The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *↩
2. Although respondent correctly points out that the shares were registered under the Securities Exchange Act of 1934, 15 U.S.C.A. 77↩ and listed on the American Stock Exchange, such listing and registration does not grant the right to petitioner to sell the shares to the public. Only registration under the Securities Act of 1933 would authorize any public distribution and there was no registration under that Act of the shares in question.
3. The restrictive legend on the share certificate contains essentially the same language.↩