*Decision will be entered under Rule 50.*

MYRON C. POOLE AND MARJORY S. POOLE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

REVOLVEX CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2664–64, 2665–64. Filed June 20, 1966.

*Richard E. Deer* and *Lester M. Ponder*, for the petitioner.
*George H. Becker*, for the respondent.

SIMPSON, *Judge:* The issues to be resolved in docket No. 2664–64 are: (1) Whether section 1235(d) of the Internal Revenue Code of 1954[1] applied to an indirect transfer of a patent made by a holder to a related person in 1956; (2) whether such an indirect transfer occurred in this case; and (3) whether a patent holder may obtain capital gains treatment for payments described in section 1235(a) if a transfer of a patent is made to a related person. The issue in docket No. 2665–64 is whether an increase in royalty payments made to the petitioner's majority shareholder was made for adequate consideration and is deductible by the corporation.

### FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

The petitioners in docket No. 2664–64, Myron C. Poole (whom we shall refer to as Poole) and Marjory S. Poole, are husband and wife. During the taxable years 1959, 1960, and 1961, they resided in Alexandria, Ind., and filed their joint income tax returns with the district director of internal revenue at Indianapolis, Ind.

In their returns for these years, the Pooles reported royalty payments from Revolvex Corp. as long-term capital gains. The respondent determined that such payments were reportable as ordinary income. As a result of this adjustment, the respondent determined a deficiency in income tax of $480.13 for 1959, $5,059.78 for 1960, and $91 for 1961. The notice of such determination was mailed to the petitioners on March 23, 1964. The royalty payments attributable to the patents assigned after 1958, the Pooles concede, are ordinary income as a result of the 1958 amendments to section 1235.

The petitioner in docket No. 2665–64, Revolvex Corp., filed corporate income tax returns for 1960 and 1962 with the district director at Indianapolis, Ind. Revolvex deducted royalty payments to Poole of $19,854.65 in 1960 and $4,350 in 1962. The respondent disallowed these deductions to the extent of $9,812.70 for 1960 and $1,912 for 1962. This action by the respondent, and the consequent adjustments in net operating losses, resulted in a determination of an income tax deficiency of $2,353.87 for 1960 and $573.43 for 1962. Notice of this deficiency was mailed to Revolvex on March 23, 1964.

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

At all times material to this case, Poole was the president of Ventoura Corp. and owned over 80 percent in value of its outstanding stock in joint tenancy with his wife. This company was engaged in the manufacture and sale of mobile homes.

Poole is an inventor and the holder of many Government patents, including a patent for the reversible window for mobile homes. This window was invented in 1950, and a patent on it was applied for in 1955. The reversible window projected outward from the trailer home and added a feeling of spaciousness much like a bay window. When the home was traveling, the window could be removed and turned around so that it projected into the interior of the trailer. This ability to reverse the projection of the window enabled the trailer home to conform to the restrictions on its width during travel on the highways. In order to reverse the window, two or three men were required.

In 1950, Poole also invented a revolvable window for mobile homes. It was similar in size and shape to the reversible window, but was so constructed that it could revolve on an axis at the top and bottom of the window. When the owner wished to move his home, he could simply revolve the window so that it projected into, rather than outward from, the coach. A patent application covering the revolvable window was filed September 21, 1955. One of the important features protected by the patent was the seal for the window which was weathertight, yet flexible enough to withstand the pressures of traveling.

Later, Poole invented a third type of window for mobile homes— the hinged bay window. This window was much larger than the reversible or revolvable windows. It differed from the revolvable window in that the revolvable window could not be attached to the floor of the coach. The revolvable window included a frame which supported the window and housed the mechanism which allowed the window to revolve. As a result, the window itself did not reach to the floor of the trailer, but only to the top of the window frame which was $2\frac{1}{2}$ inches above the floor. The hinged bay window, by contrast, was hinged to the floor of the coach so that it tilted inward and rested on the floor during transit. Because of the hinging mechanism, it was possible for the window itself to reach to the floor of the coach. Its outward projection created a cavity into which the owner could set furniture level with the floor of the mobile home. Poole began work on the hinged bay window in 1958 or 1959. He applied for a patent covering the hinged bay window and a sealing mechanism, similar to the mechanism patented with the revolvable window, on September 14, 1959.

In August of 1955, Poole exhibited the revolvable and reversible windows at a mobile home show. As a result of this exhibition,

Ventoura received several orders. Other manufacturers approached Poole requesting a license to manufacture such windows. Poole, upon consultation with his patent attorneys, decided to form a separate corporation to handle the licensing transactions. He testified that his primary purpose in forming a separate company was so that the licensee-manufacturers would not have to do business directly with a competitor such as he or Ventoura.

Revolvex's corporate records contain a document entitled "Minutes of Preliminary Meeting of Subscribers" dated January 23, 1956. Among other things, this document names the following persons as subscribers on January 23, 1956:

|  | Shares |
|---|---|
| Myron C. Poole | 5 |
| Stanley A. Raymer | 1½ |
| Gilbert W. Carmer | 1½ |
| Edgar C. Webster | 1 |
| William J. Stettner | 1 |

These minutes include a waiver of notice of a meeting of the subscribers, which was signed by such subscribers, and indicates that there was a meeting of such subscribers on January 23, 1956.

Also dated January 23, 1956, is a document labeled "Subscription Agreement and Call of Meeting." In this document, the subscribers promise to accept and pay for their shares at $100 per share. It is also signed by all of the subscribers.

The Revolvex articles of incorporation are dated January 23, 1956, and are signed by Myron and Marjory Poole and Stanley Raymer. They state that the corporation shall begin its existence with $500 paid-in capital and $100,000 authorized stock. The articles were executed under oath.

The certificate of incorporation was issued, and Revolvex's corporate existence began, on January 25, 1956.

The Pooles are not related by blood or marriage to Raymer, Webster, Stettner, or Carmer. Stanley A. Raymer was the attorney for Ventoura Corp. Gilbert W. Carmer was the production man at Ventoura.

Edgar C. Webster was also an employee of Ventoura from approximately November 1955 through September 1962. According to his recollection at the hearing, he first learned that he would receive his share of Revolvex in the spring of 1956, before he became Ventoura's office manager in May or June of that year. At the time of this hearing, he was unable to recall having voted his Revolvex stock, or whether Poole told him it would pay no dividends. However, he understood that he held his stock for Poole's convenience. He did not recall agreeing to pay for his stock, but he did sign the subscribers agreement embodying a promise to subscribe and pay for stock in

Revolvex. Upon leaving the employ of Ventoura, he sold his Ventoura stock back to Poole, but kept his share in Revolvex.

William J. Stettner commenced employment with Ventoura on January 2 or 3, 1956. He became sales manager on February 10, 1956, and received one share of Revolvex stock as a bonus for his services as sales manager in Ventoura. At the time of this hearing, he could not recall when he signed the subscription agreement or exactly when he first heard that he would be a shareholder in Revolvex. Stettner understood that no dividends would be paid on the stock, but that it might be worth money some day. Although he signed several corporate documents, he could not recall voting the share; nor was he conversant with Revolvex business affairs. Upon leaving his employment with Ventoura, Stettner received a request from Poole to repurchase Stettner's Ventoura stock. Stettner sold the Ventoura stock back, but did not resell the Revolvex stock.

On February 10, 1956, $1,000 was deposited in Revolvex's bank account. This payment was from Poole's personal funds and covered the subscription price for all of the stock.

The stubs for all issued shares of Revolvex stock bear the date of May 1, 1956. Each one, including Poole's, has documentary stamps canceled and dated May 1, 1956.

Article VI, section 4 of the Revolvex articles of incorporation provides that no shareholder may accept an offer to buy his stock without first offering the share or shares to the corporation at the same price. If the corporation refuses to purchase such share or shares, the owner may then accept the offer to buy. There was no other agreement concerning sale of Revolvex shares.

The minutes of the first meeting of the Revolvex board of directors contain a resolution authorizing its president (Poole) to enter into a contract whereby Poole would assign his patent applications to the corporation. The resolution identified the patent applications by number. They were the applications covering the reversible and revolvable windows. The resolution was dated March 1, 1956, and was signed by the Pooles and Raymer as directors of Revolvex.

By an instrument dated March 1, 1956, Poole, as an individual, entered into an agreement with Revolvex which, in part, provided as follows:

WITNESSETH:

WHEREAS, INVENTOR has invented and owns and controls the entire right, title and interest in and to certain inventions and improvements relating to WINDOWS FOR MOBILE HOMES, described and claimed in applications for Letters Patent of the United States entitled, "Mobile Homes", Serial No. 528,702, filed August 16, 1955, and application entitled "Revoluble [sic] Windows for Mobile Homes", Serial No. 535,680, filed September 21, 1955, also Design patent application entitled "Mobile Home Window", No. D 40231, filed February 20, 1956, and companion cases for same in Canada, and

WHEREAS, INVENTOR has invented and owns and controls the entire right, title and interest in and to certain inventions and improvements relating to Mobile Home Movable Walls, described and claimed in application for Letters Patent of the United States entitled "Mobile Home Movable Wall", Serial No. 566,399, filed February 20, 1956, and

\* \* \* \* \* \* \*

1. INVENTOR hereby grants to THE COMPANY the exclusive right under said inventions, and under any and all patents which may issue on said applications or for said inventions, to manufacture, use and sell said inventions throughout the United States of America, and all foreign countries.

The contract further provided that Revolvex would pay a royalty of $4.50 for each window with an expansion depth up to 15 inches and $6 for each window with an expansion depth equal to 15 inches. In addition, the company was to pay $5 per unit for all movable walls. The royalty was payable whether the units were manufactured by Revolvex or one of its sublicensees. A minimum annual royalty of $2,000 was established for so long as the contract remained in force. The agreement provided that the company would pay Poole one-half of any initial licensing fees it might earn. The agreement contained further provisions requiring the company to keep records, permitting it to enforce the patent rights, and allowing for termination upon failure to pay royalties or upon bankruptcy of the corporation. This contract was accepted by Poole in his capacity as president of Revolvex.

Revolvex, by an instrument dated March 1, 1956, granted to Ventoura a nonexclusive right to make, use, and sell the windows which were the subject of the contract between Poole and Revolvex. This agreement provided for royalties of $5 for each window with an expansion depth up to 15 inches and $6.50 for each window with an expansion depth over 15 inches. The licensee paid Revolvex $1,000 upon signing of the agreement and promised to pay a minimum annual royalty of $2,500. The Revolvex-Ventoura agreement was on different paper and typed by a different machine than the Poole-Revolvex agreement. The Revolvex-Ventoura agreement was signed by Poole on behalf of both licensee and licensor.

Revolvex, by an instrument dated March 21, 1956, granted to Schult Corp. a nonexclusive right to make, use, and sell the windows which were the subject of the contract between Poole and Revolvex. The Revolvex-Schult agreement provided for royalties per unit upon exactly the same basis as the agreement between Revolvex and Ventoura.

Revolvex engaged in several business activities in addition to the granting of the Ventoura and Schult licenses. It obtained a trademark for the word "Revolvex" and engaged in advertising activity through its executive vice president, Fred W. Lahr. Lahr Advertising Agency, Inc., handled advertising for Ventoura as well. In April

1956, Lahr, in his capacity as an executive of Revolvex, wrote to several mobile home manufacturers asking if they were interested in a Revolvex franchise. A second mailing of advertising material by Revolvex was accompanied by Schult advertising featuring the Revolvex windows. In another solicitation effort, Lahr mailed a 14-page booklet to trailer manufacturers explaining the Revolvex window. Revolvex ran full-page advertisements in the April 1956 issue of "Trailer Dealer" and in the May 1956 issue of "Trailer Topics."

Despite the fact that at least 23 manufacturers expressed an interest in the Revolvex window, Revolvex entered into no licensing agreements other than with Schult and Ventoura. When Poole discussed the topic with the sales force at Ventoura, they argued that further licensing would harm Ventoura's competitive advantage. Accordingly, Poole concluded that he would grant no further licenses.

Schult changed hands in 1957, and Poole believed that the company was taking shortcuts in production which hurt the reputation of the Revolvex window. In view of this belief, and because an exclusive license was contemplated for Ventoura, Poole caused Revolvex to discontinue its license arrangement with Schult.

The total royalties reported on their income tax returns by Revolvex and Poole during the years 1956 through 1962 are as follows:

| Year | Royalties received by Revolvex | Royalties received by Poole |
|------|-------------------------------|-----------------------------|
| 1956 | $11,034.00 | $15,000.00 |
| 1957 | 21,171.00 | 15,804.85 |
| 1958 | 14,610.00 | 10,903.15 |
| 1959 | 7,293.50 | 7,609.20 |
| 1960 | 22,321.50 | 19,854.65 |
| 1961 | 1,237.50 | 700.00 |
| 1962 | 5,550.00 | 4,350.00 |
| Totals | 83,217.50 | ·74,221.85 |

By an instrument dated September 8, 1959, Poole assigned to Revolvex all rights, including foreign rights, to the hinged bay window. Poole testified that this assignment was without "direct compensation," but that about this time his royalties from Revolvex were increased and that such increase was the consideration for the assignment.

By an instrument dated February 1, 1960, Revolvex and Poole modified their agreement of March 1, 1956. This modification provided that Revolvex would pay one-half of all initial licensing fees to Poole and a royalty of $11 per window for each window made under any licensing agreement.

By an instrument dated February 1, 1960, Revolvex and Ventoura entered into an agreement which modified their contract of March 1, 1956. This modification made the license exclusive and increased the royalties to $12.50 per window for each window unit manufactured.

Both the Poole-Revolvex modification and the Revolvex-Ventoura modification were made retroactive to January 1, 1959, and Poole signed for both parties to each contract. The agreements were not prepared until February 1, 1960, because Poole was too busy to get together with his attorney, and the attorney had forgotten to prepare the documents. Neither modification agreement mentioned the new hinged bay windows, or in any way referred to Poole's assignment of this patent application to Revolvex.

One of the principal values of the patent on the hinged bay window was that it protected the patents on the other two windows. Although all three inventions are means of expanding the space in a mobile home, the patent on the hinged bay window prevented others from manufacturing such windows and using a floor hinge rather than the attaching devices covered by the patents on the reversible and revolvable windows. Several manufacturers attempted to copy the Revolvex windows, and patent attorneys were engaged to resist these efforts and did so successfully.

The wholesale cost of the average Revolvex unit was originally incorporated in the base price of the trailers. About 1960, Ventoura made such window an optional item, and the wholesale cost ranged from $245 to $350. The current Ventoura price list asks $335 for a standard window and $385 for a floor-length window. The $385 window is the hinged bay window.

The Revolvex window was featured prominently in Ventoura's advertising. It was a material factor in selling Ventoura mobile homes. During the period 1956 to 1959, Ventoura increased its sales substantially.

OPINION

## The Poole Case

The first question to be decided is whether section 1235(a) applies to the payments which Poole received from Revolvex in consideration for his transfer of the patents for the reversible and revolvable windows. The answer to this question depends, in turn, on whether section 1235(d) applies to indirect transfers to related persons and whether in this case there was such a transfer.

The resolution of these questions involves a consideration of sections 1235 and 267. Section 1235(a) provides that a transfer of all substantial rights to a patent shall be treated as a sale or exchange of a capital asset held for more than 6 months. However, section 1235(d), as it applied to transfers in 1956, provided, "Subsection (a) shall not apply to any sale or exchange between an individual and any other related person (as defined in section 267(b))." Under section 267(b)(2), a transfer between an individual and a corporation in

which he owned more than 50 percent in value of the outstanding stock was considered a transaction between related persons.

Respondent takes the position that the payments made to Poole pursuant to the 1956 transfer of patents are taxable as ordinary income. In support of his position, the respondent urges that the facts of this case show that more than 50 percent of Revolvex's stock was owned by Poole at the time of the transfer by him to Revolvex. In the alternative, respondent urges us to find that Poole was really dealing with Ventoura, in which he owned 80 percent or more in value of the outstanding stock. He argues that Revolvex was a sham, and that Poole's purpose in selling patents to Revolvex was to avoid Federal income taxes.

Poole takes the position that section 1235(a) does apply to the payments which he received in consideration for the transfer of the patents on the reversible and revolvable windows, because on the date of such transfer, 50 percent of the stock of Revolvex was owned by unrelated persons. In support of his position, Poole argues that section 1235 was enacted to provide a tax incentive for inventors and should, therefore, be construed so as to encourage inventions. Moreover, he argues that there was a valid business reason for the creation of Revolvex and that for a time it engaged in substantial business activities in addition to granting a license to Ventoura. In the alternative, Poole contends that even if section 1235(a) does not apply to the 1956 transfer of patents, the payments which he received for such transfer are entitled to capital gains treatment under other provisions of law.

To decide this case, we must decide what approach should be followed in construing and applying section 1235. Since the applicable words of section 1235(d) expressly refer only to *a sale or exchange to a related person*, we must decide whether to look only to the form of the transfer to Revolvex or whether to look to the substance of the transfers which resulted in Ventoura, a related person, acquiring a nonexclusive license. In other words, was it the legislative purpose to provide capital gains treatment for the proceeds of the transfer of patents when there was a formal compliance with the language of section 1235, or was it the purpose to deny such a tax incentive when there was an indirect transfer to a related person?

Section 1235 was enacted as a part of the Internal Revenue Code of 1954 to provide a tax incentive for inventors by treating royalty payments as long-term capital gains.[2] However, not all royalties are en-

---

[2] Even before the enactment of sec. 1235, many decisions held that even professional inventors were entitled to capital gains treatment for the payments which they received for the transfer of patents. Mann, "Summary of Prevailing Case Law on Tax Aspects of Sales or Exchanges of Patent Rights," 40 Taxes 767 (1962). However, there was still a great deal of uncertainty as to when an inventor would secure capital gains treatment, and the enactment of sec. 1235 settled some of the controversies.

titled to this favorable tax treatment; there are conditions and requirements that must be satisfied for an inventor to receive the tax incentive. One requirement is that the inventor must part with his entire interest in the invention. This requirement appears in section 1235(a), which provides that it is applicable only if the holder of the patent transfers "all substantial rights" to the invention, and in section 1235(d), which makes the capital gains treatment inapplicable to transfers to related persons. In connection with section 1235(d), the Ways and Means Committee report states:

In order to avoid giving capital gains treatment to possible non-arm's-length transactions between related taxpayers, the section does not apply to sales between related taxpayers as defined in section 267(b), with the exception of brothers and sisters. The sale of a patent between an individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual would not, for example, be entitled to capital gain treatment under this section. It is not considered that this limitation will in any way narrow the opportunity of inventors to dispose of their patents through normal business channels; on the other hand, this limitation should prevent possible abuses arising from the sale of patents within essentially the same economic group.[3]

A similar statement appears in the Senate Finance Committee report.[4]

Some added understanding of the legislative purpose of section 1235 can be secured by considering the effect of section 1239 on the sale of patents. Had section 1235(d) not been enacted, section 1239 would have prevented a patent holder from obtaining capital gains treatment for a sale to a corporation in which he owned 80 percent in value of the outstanding stock. *Royce Kershaw*, 34 T.C. 453 (1960). Thus, the enactment of section 1235(d) indicates that the lawmakers apparently thought that the usual rules applicable to sales to controlled corporations did not go far enough in the case of a sale of a patent to a controlled corporation.

To urge us to conclude that because Congress provided a tax incentive to encourage inventors, we should allow capital gains treatment for all transfers of patents is to urge us to adopt reasoning that is manifestly fallacious. Section 1235 does not provide that any transfer of a patent entitles the holder to capital gains treatment for royalties; Congress restricted the situations in which the inventor would receive the preferential tax treatment. We as a court must interpret the law so as to carry out the legislative purpose and make sure that any inventor who qualifies receives the preferential tax treatment; but we must also carry out the legislative purpose of denying that preferential tax treatment in the situations which do not qualify. From a review of the legislation and the legislative history, we are convinced that Congress intended to require more than a mere

---

[3] H. Rept. No. 1337, 83d Cong., 2d Sess., p. A280 (1954).
[4] S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 440, 441 (1954).

formal compliance with the words of the statute in order to qualify for the favorable tax treatment. We believe that Congress meant for us to give real substance to the provisions of section 1235(d). If we accept a mere formal compliance with section 1235(d), we are then accepting a circumvention of the purpose of that provision, and are not fulfilling our responsibility. Thus, we conclude that section 1235(d) must be applied, not only to direct transfers to related persons, but also to indirect transfers to related persons.

In 1958, section 1235(d) was revised. Although the relevancy of the legislative history of the 1958 amendments in interpreting the law prior to such amendments is arguable, we believe that such legislative history confirms our approach to the interpretation of section 1235(d) as applied to the transfer of patents in 1956. There were two principal changes made by the 1958 amendments—a change to provide that an individual who owns more than 25 percent in value of the outstanding stock of a corporation is to be treated as a related person with respect to such corporation, and a change relating to the application of the provisions concerning brothers and sisters. The 1958 revision also substituted the phrase "transfer, directly or indirectly," for the phrase "sale or exchange." Since the revision of section 1235(d) was made applicable only to transfers occurring after September 3, 1958, it might be argued that section 1235(d) did not apply to indirect transfers occurring on or before such date. However, throughout the entire legislative history of the 1958 amendments there is no reference to the change referring expressly to indirect transfers.[5] Thus, it seems the lawmakers considered that this change in the wording of the statute did not constitute a change in the applicable law. The words "directly or indirectly" were apparently chosen because they were thought to describe more accurately the transfers to which section 1235(d) was intended to apply.

In interpreting and applying other provisions of the internal revenue laws, the courts in many instances had to decide whether to accept a mere formal compliance with the laws or to look to the substance of the transactions. The question has frequently arisen in connection with corporate reorganizations and transfers, and the courts have evolved the doctrine of step transactions. Under that doctrine, the tax consequences of a series of transactions are ascertained, not from the form of each transaction, but from a comparison of the economic realities at the beginning and at the conclusion of the series. Mintz

---

[5] Staffs of the Joint Committee on Internal Revenue Taxation and the Treasury Department, "Summary of the Technical Amendments Bill of 1957" (October 1956) ; Staffs of the Joint Committee on Internal Revenue Taxation and the Treasury Department, "List of Substantive Unintended Benefits and Hardships and Additional Problems for the Technical Amendments Bill of 1957" (November 1956) ; H. Rept. No. 775, 85th Cong., 1st Sess. (1957) ; S. Rept. No. 1983, 85th Cong., 2d Sess. (1958) ; Conf. Rept. No. 2632, 85th Cong., 2d Sess. (1958).

and Plumb, "Step Transactions in Corporate Reorganizations," 12th Ann. N.Y.U. Tax Inst. 247 (1954). The question has also arisen in connection with section 267 [6] and its predecessor, section 24(b) of the Internal Revenue Code of 1939. In the case of *McWilliams* v. *Commissioner*, 331 U.S. 694 (1947), the question was whether an almost simultaneous sale of securities on the stock exchange by a husband, and a purchase from the same source by his wife, constituted an indirect transfer to her. The Supreme Court held that indirect transfers included those made through an unrelated third person. The question was not merely whether title had passed, but whether there had been a real shift of economic control from the groups of persons named in section 24(b) of the Internal Revenue Code of 1939. The Supreme Court looked to the reality of the situation and found that there had been an indirect transfer between husband and wife. The Tax Court has reached a similar result where, by prearrangement, property was sold to a wholly owned corporation through third persons not designated by the Code as related parties. *Robert Boehm*, 28 T.C. 407 (1957), affirmed per curiam 255 F. 2d 684 (C.A. 2, 1958).

We hold that the transfer of patents from Poole to Revolvex was not a transfer to an unrelated person, as contemplated by section 1235, because it was, in substance, an indirect transfer to Ventoura, a related person. The patents remained within essentially the same economic unit and subject to the holder's control.

The facts show clearly that Poole could and did control Revolvex. Although there is a dispute as to when Webster and Stettner became shareholders of Revolvex, it is unnecessary for us to resolve that dispute. Even if Raymer, Carmer, Webster, and Stettner were shareholders at the time the patents were transferred to Revolvex, they were shareholders who could be influenced by Poole. Since Raymer was the attorney for Ventoura, and since the others worked for Ventoura, they would no doubt carefully heed any request or suggestion made by Poole. Poole supplied the capital contribution for all of them. Webster understood that he held the Revolvex stock as a convenience for Poole, and Stettner never expected dividends to be paid on the stock. The articles of incorporation of Revolvex required any shareholder to offer his stock to the corporation for purchase before he could sell it to any other person. Webster and Stettner were not familiar with the affairs of Revolvex and did not remember ever participating in any shareholder deliberations.

Poole's control of Revolvex for the benefit of Ventoura is further shown by the course of conduct he adopted. Poole, his wife, and Ven-

---

[6] Sec. 267 expressly disallows a loss when there is an indirect sale or exchange to a related person. However, since we have concluded that the legislative purpose of sec. 1235(d) also sweeps in indirect transfers, the problem in applying the two provisions is similar.

toura's attorney made up the board of directors and were the officers of the company. The Poole-Revolvex license and the Revolvex-Ventoura license were both executed on the same day by Poole. In fact, all of Revolvex's contracts were negotiated and signed by Poole. With the exception of the Schult license, Poole signed all contracts for both parties. The terms of these contracts were such that Revolvex could never earn any significant income; it was merely a conduit to pass the royalties through to Poole. At the outset, Revolvex did engage in business activities in addition to the granting of the Ventoura license; nevertheless, Revolvex was used to transfer a license to Ventoura, and the fact that it engaged in some other business activities should not obscure the indirect transfer to Ventoura. Moreover, Poole candidly admitted that when he became convinced that it was in the best interests of Ventoura for that company to have an exclusive license, the Schult license and the attempts to secure other licensees were terminated. Thus, Poole used his control of Revolvex in such a way as to enhance the profits of Ventoura—but not so as to make profits for Revolvex.

We also find unsound Poole's alternate contention that if section 1235 does not apply to the 1956 transfers, he is entitled under other provisions of law to capital gains treatment for the royalties paid in connection with such transfers. The legislative history with respect to section 1235 explains that a holder's recourse to prior case law is proper only when the transaction is not one described in section 1235(a). In other words, if the payments for a patent are contingent upon productivity, use, or disposition, or if they are payable periodically over a period generally coterminous with the transferee's use of the patent, section 1235 is the holder's exclusive provision for qualifying for capital gains treatment.[7] Moreover, this interpretation of the effect of section 1235 is supported by an analysis of the effect of the provisions of the section. If a holder transfers a patent resulting in the payment of royalties in the manner described in section 1235(a) to a related person, and if we were to hold that such a transfer is entitled to capital gains treatment under another provision of law, we would be nullifying section 1235(d). Since section 1235(d) was included in the law, it must have been done for a pur-

---

. [7] "It is the intention of your committee that, if the mode of payment is as described in subsection (a), the sale of a patent by any 'holder' must qualify under the section in order for such 'holder' to obtain capital gain treatment." (S. Rept. No. 1622, 83d Cong., 2d Sess., p. 441 (1954).)

We are aware that sec. 1.1235–1(b), Income Tax Regs., provides that if sec. 1235 does not apply because a transfer is made to a related person, the tax consequences of the transfer are to be determined under other provisions of law. If that section of the regulations is intended to imply that when a holder transfers a patent and receives payments in the manner described in sec. 1235(a), such payments may qualify for capital gains treatment, the regulations must yield to the contrary legislative purpose.

pose—the purpose of denying capital gains treatment to a holder's transfer to related persons when the payments are of the type described in section 1235 (a).

In addition, we believe that the royalties attributable to the Ventoura license should not receive capital gains treatment for the reason that such license was nonexclusive. Although Poole granted an exclusive license to Revolvex, he could and did control Revolvex so that the granting of that exclusive license did not transfer the rights to the patent beyond his control. What he actually transferred to Ventoura was merely a nonexclusive license; and if he had done that directly, it would be clear that the payments for such transfer are not entitled to capital gains treatment. We think that since Revolvex was used as a means of transferring such license to Ventoura, we should view the transfer as if it had been made directly from Poole to Ventoura. For this additional reason, we reject the Pooles' alternative argument that they are entitled to capital gains treatment even if section 1235 does not apply to the 1956 transfers.

Since we have concluded that Revolvex was used to make an indirect transfer of patents to Ventoura, it follows that none of the payments received by Poole from Revolvex is entitled to capital gains treatment. Some of those royalties were due to the license granted to Schult, an unrelated person; but that license was nonexclusive and could not give rise to capital gains.

### The Revolvex Case

The only issue in this case is whether an increase in royalty payments pursuant to the modification agreement between Revolvex and Poole was supported by adequate consideration and is deductible by the corporation in 1960 and 1962.

The respondent takes the position that the increased royalties were paid without consideration, because the contract of March 1, 1956, required Poole to assign all patents on improvements in the reversible and revolvable windows to Revolvex. Respondent also suggests that the new patents were not intended to be consideration for the increased royalty, and that Poole's oral testimony to the contrary is barred by the parol evidence rule. In the alternative, respondent urges that the payments in question were in reality being made by Ventoura, and that Revolvex's transactions should be ignored. We dismiss this alternative argument out of hand, because if Revolvex's transactions are disregarded, it follows that the company had no taxable income, and a determination of deficiency against it could not be sustained under any theory.

Revolvex argues that the increased royalty payments were made as consideration for the assignment on September 8, 1959, of patent applications on the hinged bay window. It argues that this patent

had substantial value and was not included in the original agreement dated March 1, 1956, between Revolvex and Poole.

We have examined the Revolvex-Poole agreement of March 1, 1956, and find that it did not obligate Poole to assign the patent applications for the hinged bay window. The 1956 contract clearly identified by number the patent applications included in the contract and bound Poole to assign the patents on those applications only. The contract did not mention the hinged bay window. The respondent's reliance on *Thomas Flexible Coupling Co.* v. *Commissioner*, 158 F. 2d 828 (C.A. 3, 1946), certiorari denied 329 U.S. 810 (1947), affirming a Memorandum Opinion of this Court, is misplaced. In *Thomas Coupling*, the holder assigned "all United States Letters Patents she now owns on flexible couplings and which may be hereafter granted to her and all United States Letters Patents on future improvements on flexible couplings which may be obtained or acquired by her." Seventeen years after such assignment she obtained two patents on improved flexible couplings and assigned them to the taxpayer corporation for $3,500 and specified royalties. The Tax Court held that those payments were not ordinary and necessary business expenses of the corporation, because the petitioner was already entitled to the patents by virtue of the original assignment. The Third Circuit affirmed, holding that even if the agreement was valid under State law and the Tax Court was wrong in finding no consideration, the expense was not ordinary and necessary. The *Thomas Coupling* case is of no help to the respondent because the contract in this proceeding has no language requiring an assignment of future patents.

We reject the respondent's argument that the parol evidence rule prevents Poole from testifying that the increase in royalties was consideration for the assignment of a patent not mentioned in the modification agreement. We have held that the parol evidence rule may not be invoked by the respondent, who was not a party to the contract, and that if the question is whether consideration was paid, the rule has no application. *C. L. Nichols*, 43 T.C. 135 (1964); *Haverty Realty & Investment Co.*, 3 T.C. 161 (1944), acq. 1944 C.B. 13. Therefore, we have considered Poole's testimony concerning the consideration for the increased royalties.

Poole testified that his assignment of the patent on the hinged bay window not only gave Revolvex a patent on a new kind of window, but it protected the earlier patents on the reversible and revolvable windows. Thus, the assignment justified an increase in the royalties payable in connection with the reversible and revolvable windows. Poole further testified that the increase in royalties, although not precisely simultaneous with the assignment, was intended to be the consideration for the assignment. The respondent has offered no contradictory testimony, and we find Poole's evidence believable.

It makes no difference whether we regard the royalties paid to Poole as the purchase price for the patents or as royalties for their use. Payments made for the acquisition of title to patents, which are measured by the use or value of the patents during the year, constitute the reasonable allowance for depreciation of such patents during that year. *Associated Patentees, Inc.*, 4 T.C. 979 (1945), acq. 1946-1 C.B. 1. Payments which are royalties for the use of patents are ordinary and necessary business expenses in the year paid or accrued. O.D. 440, 2 C.B. 215 (1920). Therefore, whether or not Revolvex is considered as owning the patents in question, it was legally bound to make the payments in question and the full amount of these payments is deductible.

> *Decision will be entered for the respondent in docket No. 2664-54.*
>
> *Decision will be entered for the petitioner in docket No. 2665-54.*