Peerless Steel Equipment Company v. Commissioner.
Peerless Steel Equipment Co. v. Commissioner
Docket No. 3653-65.
United States Tax Court
T.C. Memo 1967-181; 1967 Tax Ct. Memo LEXIS 79; 26 T.C.M. (CCH) 880; T.C.M. (RIA) 67181; September 11, 1967
*79 An employee profit-sharing trust established by petitioner leased business property to petitioner for a period of 20 years. At the time of entering into this lease, petitioner paid the trust $98,500 advance rent, which, by the terms of the lease, was considered fully earned by the trust upon signing and delivery of the lease. About 5 years later, petitioner, for business reasons, decided to abandon the leased property, and the trust sold the property and agreed to deliver possession to the purchaser. After the sale was agreed upon, the trust and petitioner executed an agreement providing that petitioner would receive $46,981.82 for the cancellation of its interest in the lease. Held: The applicability of sec. 1241, I.R.C. 1954, depends upon whether the lessee received a payment for the cancellation of a lease. The decision of such question in this case is based upon the substance of the transaction, not its form. Mervin M. Wilf, for the petitioner. Dennis C. DeBerry, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion SIMPSON, Judge: The respondent determined deficiencies in income tax of the petitioner of $7,440.76 for its taxable year 1955, $8,732.17 for its taxable year 1956, and $161.25 for its taxable year 1958. The respondent's adjustments for the years 1955 and 1956 were the result of the elimination of a net operating loss reflected on the petitioner's return for the year 1958. The only issue for decision is whether a payment received by a lessee from its lessor at or about the time of the cancellation of the lease was for the cancellation of the lease within the meaning of section 1241 of the Internal Revenue Code of 1954. [1]
*81 Findings of Fact Some of the facts were stipulated, and those facts are so found. The petitioner is a Pennsylvania corporation engaged in the manufacture of steel office equipment with its principal place of business at Philadelphia, Pennsylvania, at the time the petition was filed in this case. For its taxable years ending June 30, 1955, through June 30, 1958, the petitioner filed its Federal income tax returns, using the accrual method of accounting, with the district director of internal revenue, Philadelphia, Pennsylvania. In 1952, the petitioner purchased, for expansion purposes, vacant ground immediately adjoining its premises. However, this property was not usable for plant expansion at that time because it was crisscrossed by projected streets on the Philadelphia city plan and the property required extensive fill. The need for expansion arose from the petitioner having received a large contract for the manufacture of desks. On June 5, 1952, the petitioner established a profit-sharing trust (the Trust) for its employees. At all times here relevant, the trustees of the Trust were also the principal executive officers of the petitioner. On December 29, 1952, the Trust *82 purchased property located on Rising Sun Avenue in Philadelphia at an aggregate cost of $246,858.11. This property was located approximately 3 blocks from the petitioner's plant. On the same day, the petitioner entered into a lease with the Trust for use of the property for assembling and warehousing purposes. The lease was for a term of 20 years from January 1, 1953, and provided for an annual fixed rental of $18,600. The lease provided that the lessee pay the lessor at the signing and delivery of the lease the sum of $98,500, representing part of the rent for each year of the term. The lease provided that such sum "is to be considered as fully earned upon signing and delivery of this Lease and no part is to be applied on or in satisfaction of any of the other payments provided for in this Lease". The amount of each year's fixed rent chargeable against the prepaid rent account was the difference between the total fixed rent ($18,600) and certain current cash rental payments specified in the lease (ranging from $10,281.25 to $16,581.25). The petitioner's use of the Rising Sun Avenue property resulted in additional, unforeseen expenses. The petitioner found that it could not put heavy *83 machinery on the second floor of the building located on the property; therefore, it was unable to use the building for the complete manufacture of desks as it had planned. The second floor was used for the warehousing of filing cabinets. It was then necessary to transport component parts for desks from the petitioner's main plant to the leased property and to transport filing cabinets from the main plant to the leased property for warehousing. These conditions resulted in the use of one of the petitioner's executives at the leased property, the use of an additional truck and two truck drivers, and in damage to desk parts from the transportation between plants. Between 1952 and 1957, fill was added to the vacant land adjacent to the petitioner's plant. In 1957, the petitioner built a 9,000-square-foot addition to its plant on this vacant land. On January 27, 1958, the Mayor of Philadelphia signed an ordinance that authorized the striking of the projected streets in the city plan that that were to have crisscrossed part of the vacant land. Thereafter, in 1958, the petitioner erected an additional 7,500-square-foot building on the vacant land. In the early part of 1957, at the time *84 the first and second additions to the main plant were being planned, the petitioner decided to vacate the Rising Sun Avenue plant. By consolidating its operations at its main plant and eliminating the additional handling costs resulting from the operation of the leased property, the petitioner could save $30,000 or more a year. After the completion of the expansion program at the main plant, the petitioner would have saved money by vacating the leased property and continuing to pay rent on it, rather than continue its operations at that plant. Early in 1957, the Trust decided to sell the Rising Sun Avenue property or lease the property to some other party. In February 1958, the Trust entered into an agreement to sell the property to General Fire Extinguisher Co. of Pennsylvania (General) for the price of $225,000. At the time of settlement, February 28, 1958, General agreed to permit the Trust to remain in possession, without rental liability, to March 5, 1958, for the entire building and to April 1, 1958, for two-thirds of the upper floor. On March 5, 1958, an independent certified public accountant suggested to the petitioner that its attorney be consulted with respect to the *85 termination of the lease. This attorney, in a letter dated March 7, 1958, and addressed to the president of the petitioner, stated that the Trust could refund to the petitioner "$46,981.82 from the advance rental payment of $98,500.00 and thus bring the trust out at the point where it will have absolutely no gain and no loss on the transaction". The attorney further stated that: * * * if the transaction can result in the trust not being out of pocket one cent we are sure it can never be criticized. While the lease says that the acvance [advance] rental payment shall not be refundable, the lease also says that the Company shall have the right to occupy for 20 years. In order to give the trustees the right to terminate the lease in advance, it is entirely reasonable that the deferred rentals should be refunded to the extent that the trustees come out whole. The petitioner's attorney enclosed a draft agreement which he suggested be executed in order to make a record of the transaction between the petitioner and the Trust. This agreement was executed by representatives of the petitioner and the Trust sometime on or after March 7, 1958, but was dated February 14, 1958. The agreement *86 stated that the Trust was the owner of the property leased to the petitioner and then provided in part: WHEREAS, under said lease the Company paid advance lease rentals of $98,500.00 which by the terms of such lease are not refundable in the event the lease is cancelled by the Company; and WHEREAS, the term of the lease will not expire until December 31, 1973 during which time the Trustees have no right to cancel assuming full performance by the Company; and WHEREAS, the Trustees now desire to sell the premises 6801 Rising Sun Avenue under terms which will require it to cancel the said lease; NOW, THEREFORE, it is hereby agreed as follows: 1. The Company will agree to cancellation of the said lease and to vacate the leased premises by April 1, 1958 in consideration of the repayment to it of $46,981.82 from the advanced rentals already paid as mentioned above. The $46,981.82 referred to in the written agreement was paid by the Trust to the petitioner. This amount was computed by subtracting $33,097.36, the amount of the loss by the Trust on its sale of the property, from $80,079.18, the balance of the advance rent account. The petitioner, on its books, treated the amount *87 of $33,097.36 - the balance of the advance rental account after subtracting the $46,981.82 payment received from the Trust - as a cost of terminating the lease. The Trust, on its books, treated the $46,981.82 payment as a partial refund to the petitioner of the advance rental payments. The petitioner deducted on its income tax return for its taxable year ending June 30, 1958, the $33,097.36 referred to on its books as "Lease Termination Cost" and $750.83, representing a writeoff of the balance of petitioner's account for a new roof added by it to the leased property. On its return, the petitioner labeled the sum of these two amounts as "Lease Termination Cost". Opinion In this case, we have, in a new setting, the old question of whether the tax consequences of a transaction are to be determined by the form in which the parties cast it or whether we are to pierce the form to learn what really happened, and why. The respondent contends that the petitioner received a payment from the Trust for the cancellation of the lease; that therefore section 1241 applies to the cancellation causing it to be treated as the sale or exchange of the lease; that the loss sustained by the petitioner *88 is thus treated as a loss on the sale of a capital asset; and that in view of the relationship between the petitioner and the Trust, section 267 [2] denies a deduction for such a loss. The petitioner, on the other hand, urges us to disregard what was said in the lease cancellation agreement and to find that the payment which it received from the Trust was not for the cancellation of the lease. These contentions require us to decide whether the applicability of section 1241 depends upon a finding that the payment was for the cancellation of the lease and to decide whether, in answering such question, we are to be guided by the agreement of the parties, or are to look behind that agreement. *89 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS. (a) Deductions Disallowed. - No deduction shall be allowed - (1) Losses. - In respect of losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b). * * * (b) Relationships. - The persons referred to in subsection (a) are: * * *
(4) A grantor and a fiduciary of any trust; * * *
Section 1241 provides: SEC. 1241. CANCELLATION OF LEASE OR DISTRIBUTOR'S AGREEMENT. Amounts received by a lessee for the cancellation of a lease, or by a distributor of goods for the cancellation of a distributor's agreement (if the distributor has a substantial capital investment in the distributorship), shall be considered as amounts received in exchange for such lease or agreement. The committee report explains that this provision grows out of the litigation over whether a lessee who received a payment for the cancellation of his interest in a lease was entitled to capital gains treatment of the payment. See, S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 115, 444-445 (1954). In some cases, it had been held that such a payment was treated as a capital gain. McCue Bros. & Drummond, Inc., 19 T.C. 667 (1953), affd. 210 F. 2d 752 (C.A. 2, 1954), cert. denied 348 U.S. 829 (1954); Louis W. Ray, 18 T.C. 438 (1952), affd. 210 F. 2d 390 (C.A. 5, 1954), cert. denied 348 U.S. 829 (1954); Isadore Golonsky, 16 T.C. 1450 (1951), affd. 200 F. 2d 72 (C.A. 3, 1952), cert. denied 345 U.S. 939 (1953). However, in Commissioner v. Starr Bros., 204 F. 2d 673 (C.A. 2, 1953), revg. 18 T.C. 149 (1952), it was held that the cancellation of a distributor's agreement was not a sale or exchange and that the distributor did not receive a capital gain. Section 1241 eliminated any uncertainty by providing that the cancellation is to be treated as a sale or exchange. Yet, in all these cases, the lessee was negotiating at arm's-length for a cancellation of the lease or agreement and received a payment for his relinquishment of his rights under the lease or agreement. Thus, we carry out the purpose of the legislation if we limit it to situations in which the payment induces the cancellation of the lease or distributor's agreement. Often, it is said that the application of the internal revenue laws is to be based upon the substance of transactions, not upon their form; otherwise the intended results of the laws are not achieved. Gregory v. Helvering, 293 U.S. 465 (1935); Helvering v. Lazarus & Co., 308 U.S. 252 (1939). Yet, there are exceptions to this general rule; there are instances when the tax law is made to turn upon the form of the transaction. For example, in determining whether payments are alimony or child support, their designation is decisive. Commissioner v. Lester, 366 U.S. 299 (1961); Chester L. Tinsman, 47 T.C. 560 (1967). In addition, an individual who has chosen to operate his business through a corporation cannot ignore the corporation. Ernest H. Weigman, 47 T.C. 596 (1967), on appeal (C.A. 9, June 15, 1967); Omaha Nat. Bank v. Commissioner, 183 F. 2d 899 (C.A. 8, 1950), affg. a Memorandum Opinion of this Court. Our task is to find the line for determining when to look to substance and when to rely upon form. In many cases, the Commissioner of Internal Revenue has asked the courts to strike down arrangements that provide mere formal compliance with the law, and the courts have held that substantial compliance is required. Gregory v. Helvering, supra; Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Myron C. Poole, 46 T.C. 392 (1966). These cases illustrate one line of decisions in which the courts looked through form to substance. The courts will not allow taxpayers to circumvent the purposes of the law by mere form. In this case, we have a taxpayer asking us to ignore the form that he created and to look to the substance of what actually occurred. It has been suggested that the Commissioner of Internal Revenue should be able to act in reliance upon the form in which taxpayers cast their transactions; in other words, taxpayers should not be allowed to repudiate what they have done. See the dissenting opinion of Justice Douglas in Bartels v. Birmingham, 332 U.S. 126 (1947). However, taxpayers have been allowed to attempt to show that their true intent was different from that expressed in their contracts, and when the courts have been convinced by them, the tax consequences have been based upon the substance of the transaction. In Helvering v. Tex-Penn Co., 300 U.S. 481 (1937), the Supreme Court responded to a request by the taxpayers to look through what was said to find out why it was done. In Bartels, supra, the operator of a dance hall entered into a contract with the leader of a dance band to provide music. The contract included the declaration that the musicians were the employees of the operator of the dance hall. Neverthless, the Court ignored that declaration and examined the relationships among the musicians, the leader of the band, and the operator of the dance hall. The Court found that in fact the musicians were employees of the leader of the band. In Landa v. Commissioner, 206 F. 2d 431 (C.A.D.C. 1953), remanding 11 T.C.M. 420 (1952); 211 F. 2d 46 (C.A.D.C. 1954), revg. 12 T.C.M. 597 (1953), the court, at the request of the taxpayer, also looked behind the contract in which the taxpayer had agreed to make certain payments to his former wife. The contract declared that such payments were in satisfaction of an indebtedness of the taxpayer. However, the court found that in fact there was no indebtedness and that the payments grew out of the marital obligations. See, Frank Ciaio, 47 T.C. 447 (1967), in which the Landa case was cited with approval. Though there may be some attractive reasons for requiring a taxpayer to adhere to the form that he has created, the even-handed application of the law requires us to allow taxpayers the opportunity to show that their true intent was different from what was said, and so the courts have done. The question of substance or form has been the subject of a number of cases involving covnenants not to compete. These cases grow out of a situation in which there is a sale of a business, a covenant not to compete, and an agreement allocating a portion of the consideration to the covenant. The courts have generally held that the parties are bound by their written contract unless they can produce strong proof showing that in truth a different allocation was intended. Ullman v. Commissioner, 264 F. 2d 305 (C.A. 2, 1959), affg. 29 T.C. 129 (1957); Hamlin's Trust v. Commissioner, 209 F. 2d 761 (C.A. 10, 1954), affg. 19 T.C. 718 (1953); Eleanor M. Lutz, 45 T.C. 615 (1966); Benjamin Levinson, 45 T.C. 380 (1966); Carl L. Danielson, 44 T.C. 549 (1965). But see, Commissioner v. Danielson, 378 F. 2d 771 (C.A. 3, May 2, 1967), cert. applied for July 17, 1967. Thus, these cases developed the rule that taxpayers must produce strong proof to repudiate their contracts, but when there is strong proof, the substance of the transaction governs the tax consequences. We conclude that in the case before us, we must examine all the circumstances surrounding the cancellation of the lease, and if the proof is sufficient, the tax consequences should be determined by reference to substance and not form. Under the terms of the lease, the Trust apparently had the right to retain the entire amount of the advance rental payments. The petitioner suggests that a part of such payments was refunded out of a sense of equity. If we find that the payment by the Trust to the petitioner was not for the cancellation of the lease, there may be a question as to whether the trustees of the Trust have properly carried out their fiduciary responsibilities. There may also be a question as to whether a payment under such circumstances affects the exemption of the Trust. However, these questions are not for decision by this Court at this time, and our decision is based on the petitioner's right to have us examine the substance of the transaction without any reservations as to the propriety of the payment. Since the same individuals served as the officers of the petitioner and the trustees of the Trust, there is some difficulty in determining when they were acting for the petitioner or for the Trust. Nevertheless, it seems clear that, while acting for the petitioner, they decided to vacate the leased property. We received testimony that the petitioner would have abandoned the lease without receiving any payment for relinquishing its interest, and the circumstances corroborate this testimony. By 1957, the petitioner either had, or it was clear it soon would have, additional facilities on the adjoining property. It was costing the petitioner more to operate in the leased property than the rent which it was required to pay under the lease. Thus, even if it had to continue to pay rent for the property, it would have saved money by vacating the property. It is suggested that the Trust decided to sell the property, but it appears to us that in making such a decision, the Trust was in fact carrying out the objectives of the petitioner. In addition, the circumstances show that the decision to return part of the advance rental payment was made after the fact. A decision had been made to discontinue the use of the leased property and to sell it or find another lessee, and a sale had actually been made, including a commitment to turn over possession to the purchaser - all before there was any arrangement to return part of the advanced rental payments. Only after the sale was made was it suggested that part of the advance rental payments could be returned to the petitioner, and only then was the lease cancellation agreement suggested by the attorney and executed by the parties. The amount of the payment to the petitioner was not bargained for; it was figured by the petitioner's attorney and accountant as the amount which the Trust could pay to the petitioner without realizing any gain or loss on the sale of the property. All these facts are sufficient to convince us that, under the strong-proof test, the petitioner did not receive a payment for the cancellation of its interest in the lease. Since we have found that the petitioner did not receive a payment for the cancellation of the lease, section 1241 does not apply, and the $33,097.36 loss which the petitioner sustained as a result of the termination of the lease is deductible. In addition, the petitioner may deduct the $750.83 representing a writeoff of the balance of the petitioner's account for a new roof added by it to the leased property. In order to reflect other, uncontested adjustments in the notice of deficiency, Decision will be entered under Rule 50.↩