NEWMAN, Circuit Judge,
concurring in part, dissenting in part.
I agree that the district court erred in its grant of summary judgment, but I must, with all respect to my colleagues, dissent from their decision that the issue of contractual intent requires trial. The agreements transferring the Bennett patent property to Vector are clear that the only issued patent included in the transfer is U.S. Patent No. 6,033,553 (“the '553 patent”). The rules of contract and patent law do not permit the interpretation that another patent on a different invention, a patent fully known to Vector, was nonetheless silently conveyed by these agreements. Since as a matter of law only one conclusion is reasonable, there is no need for prolongation of this litigation with its costs, delays, and burdens on parties and courts.

The three contracts for the '553 patent and four patent applications

It has long been known that metals such as zinc, when deployed in steel-reinforced concrete, can reduce corrosion of the steel by “galvanic cathodic protection.” [1] Relevant to this dispute are two forms of this technology. In the first form, called “me-tallized” or “distributed” zinc anode technology, the zinc anode is distributed over the surface of the steel-reinforced concrete. This technology, as enhanced by use of lithium nitrate and lithium bromide, is the subject of the '553 patent, issued on March 7, 2000 to Jack Bennett.
The second form is called “embedded” or “discrete” zinc anode technology, wherein discrete anodes are embedded in the steel-reinforced concrete. This technology, with lithium nitrate and lithium bromide enhancement, is the subject of U.S. Patent No. 6,217,742 (“the '742 patent”), issued on April 17, 2001 to Jack Bennett. The '742 patent is identified as a continuation-in-part of the '553 patent, and contains new matter describing and claiming the lithium-enhanced embedded zinc anode technology.
On December 20, 2001 Mr. Bennett entered into three agreements with the Vector companies. Mr. Bennett is described as “a leader in the field of galvanic protection” and “an independent contractor of substantial reputation.” Euclid App. Br. at 2. He has had business dealings with *1347 both Euclid and Vector. Each of the three agreements lists the '553 patent and four patent applications, and describes the transferred subject matter as “the specific use of LiN03 and LiBr to enhance the performance of metallized zinc anodes.” The '742 patent excludes metallized zinc anodes from the scope of its claims.
The first agreement between Mr. Bennett and Vector, entitled “Patent Transfer Agreement,” states the transaction as follows:
TRANSFER OF PATENTS AND PATENT APPLICATIONS APPOINTMENT
2.The Transferor hereby sells, transfers and assigns to the company all of his interest in the following patents and patent applications (all of which, and all rights, title and interests thereto, being collectively referred to in the Agreement as the “Patents”):
1. Issued U.S. Patent 6,033,553. This patent claims the specific use of LiN03 and LiBr to enhance the performance of metallized zinc anodes;
2. US Application No. 08/839,292 filed on April 17,1997,
3. US Application No. 08/731,248, filed on October 11, 1996 (now abandoned),
4. EPO Application No. 99122342.1, filed November 9,1999, and
5. Canadian Application No. 2288630, filed November 8,1999.
The only issued patent on this list is the '553 patent. There is no mention of the '742 patent which had issued eight months before the contract was executed, no mention of embedded zinc anodes, and no end-clause referring to continuing applications, as in the third agreement.
The second agreement, entitled “Consulting Agreement,” lists the same “issued U.S. patent 6,033,553,” again describes it as relating to “metallized zinc anodes,” and provides for consulting services for “the subject technology.” The agreement states in relevant part:
SERVICES
2. The Consultant agrees that the services to be provided under this consulting agreement will be provided personally by JACK BENNETT.
The Consultant further agrees that he will provide consultation to the Company relating to the application of the technology as described in the US, Canadian and European applications for patents and issued U.S. patent as follows:
1. Issued U.S. Patent 6,033,553. This patent claims the specific use of LiNOs and LiBr to enhance the performance of metallized zinc anodes;
2. US Application No. 08/839,292 filed on April 17,1997,
3. US Application No. 08/731,248, filed on October 11, 1996 (now abandoned),
4. EPO Application No. 99122342.1, filed November 9,1999, and
5. Canadian Application No. 2288630, filed November 8,1999.
Services shall include transfer of technology, assistance with marketing and data, training, assistance with field applications, and any other questions relating to the subject technology that falls within the. expertise and knowledge of the Consultant as of the date of execution of this Agreement.
Again, no mention is made of Bennett’s separately patented process for lithium-enhanced embedded anodes, the subject of the '742 patent, and there is no end-clause as appears in the third agreement, entitled “Patent Assignment,” following in its entirety:
*1348 PATENT ASSIGNMENT
I,JACK BENNETT, [address], in consideration for $25,000.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged do hereby sell and assign to VECTOR CORROSION TECHNOLOGIES LTD. [address] all my interest in the United States, Canada and in all other countries in and to my US, Canadian, and European applications for patents and issued U.S. patent, namely:
1. Issued U.S. Patent 6,033,553. This patent claims the specific use of LiN03 and LiBr to enhance the performance of metallized zinc anodes;
2. US Application No. 08/839,292 filed on April 17,1997,
3. US Application No. 08/731,248, filed on October 11, 1996 (now abandoned),
4. EPO Application No. 99122342.1, filed November 9,1999, and
5. Canadian Application No. 2288630, filed November 8,1999,
any and all divisional applications, continuations, and continuations in part together with the entire right, title and interest in and to said applications, and to all divisional applications, continuations, and continuations in part thereof, the right to claim priority therefrom under the International Convention, and any and all Letters Patent which may issue or be reissued for said invention to the full end of the term for which each said Letters Patent may be granted; and hereby authorize the issuance to said assignee of any and all said Letters Patent not already issued as the assign-ee of entire right, title and interest in and to the same, for the sole use and benefit of said assignee, its successors, assigns or legal representatives; and hereby covenant and agree to do all such lawful acts and things and to execute without further consideration such further lawful assignments, documents, assurances, applications, and other instruments as may reasonably be required by said assignee, its successors, assigns or legal representatives, to obtain any and all Letters Patent for said invention and vest the same in said assignee, its successors, assignees or legal representatives.
The district court accepted Vector’s argument that the reference in this end-clause to “continuations in part” assigned the '742 patent to Vector, and declined to consider the evidence of contractual intent that Euclid proffered to show that this reading was incorrect. Although my colleagues, in an abundance of caution, remand for trial of contractual intent, it is quite clear that the only reasonable construction of these agreements is that they assigned the specifically listed '553 patent and four applications directed to metallized anode technology, and continuing or reissue applications and patents “for said invention,” but did not assign the previously issued yet unlisted '742 patent for a different invention.
None of the three agreements mentions the '742 patent or embedded anode technology. This catch-all reference to continuing and reissue applications cannot be interpreted as assigning a patent that had issued eight months earlier on a different invention and whose existence was known to Vector.[2] The reference to “continua *1349 tions in part” in the end-clause is directed to “said invention,” the subject of the transfer and defined for the '553 patent as “enhanc[ing] the performance of metallized zinc anodes.” The '742 patent is not for “said invention.”
The distinct subject matter of the '553 and the '742 patents is stressed in the patents themselves. The '553 specification and claims are directed to metallized distributed anodes, while the '742 specification and claims are directed to embedded distinct anodes. The '742 specification describes the invention as for “embedded anodes comprised of individual elements that are spaced apart from one another, as opposed to distributed anodes that essentially cover the entire concrete structure surface.” '742 patent, col. 3, lines 30-33. The claims of the '742 patent are founded on new matter that is not present in the '553 specification, and the '742 patent drew the explicit distinction from the me-tallized anode technology of the '553 patent.
Although my colleagues suggest that the reference to “continuations in part” in the end-clause of the third agreement introduced an ambiguity that warrants trial of contractual intent, that clause is not reasonably construed as assigning Bennett’s '742 patent to Vector. Such a clause is not unusual in technology contracts, when the parties agree that their deal includes future developments of “said invention,” including patents that “may issue or be reissued.” Such a prospective provision does not remove the obligation of contracting parties to identify the existing patent properties that are being assigned.
It is a truism of patent practice that transfers of patent property require specificity as to the property transferred. See, e.g., Estate of Paxton v. Comm’r, 44 T.C.M. (CCH) 771 (T.C.1982) (“During all times herein, it was a well-established trade practice for patent lawyers to describe and identify inventions with specificity in legal instruments licensing the right to exploit, assigning or otherwise affecting property rights in the invention.”); Poole v. Comm’r, 46 T.C. 392, 406, 1966 WL 1165 (1966) (“We have examined the Revolvex-Poole agreement- of March 1, 1956, and find that it did not obligate Poole to assign the patent applications for the hinged bay window. The 1956 contract clearly identified by number the patent applications included in the contract and bound Poole to assign the patents on those applications only. The contract did not mention the hinged bay window.”).
The practice requiring specificity of identification of transferred patents is so entrenched, that it would smack of misfeasance to have omitted the known '742 patent from the list of assigned properties, if the parties had intended that it be assigned. The now-asserted assignment to Vector of the '742 patent was never recorded in the Patent and Trademark Office, as authorized by 35 U.S.C. § 261, although the assignment of the '553 patent was recorded within a few weeks after execution of the 2001 agreements. Vector also promptly recorded the assignment of the patent that issued in 2003' on U.S. Application No. 08/839,292, which is item No. 2 listed in the three contracts. Vector obviously knew the rules of recordation, but did not place the asserted assignment of the '742 patent into position for recordation. PTO regulations state:
An assignment relating to a patent must identify the patent by the patent number. An assignment relating to a national patent application must identify the national patent application by the application, number (consisting of the series code and serial number, e.g., 07/123,456).
37 C.F.R. § 3.21. Euclid also points out that Vector did not pay the maintenance *1350 fee that was due in 2004 for the '742 patent; Mr. Bennett paid the fee. These are not factual issues that require remand; they are undisputed matters of public record. See 37 C.F.R. § 3.12 (assignment records are open to public inspection).
These actions are an unequivocal negation of contractual intent to assign the '742 patent to Vector in a 2001 agreement. It is not reasonable to conclude that the end-clause mentioning continuations “for said invention” was intended to assign a different, existing patent on a different invention. Even if the Patent Assignment agreement were remotely “susceptible” to this construction, it is not “rational and probable.” See Graham v. Drydock Coal Co., 76 Ohio St.3d 311, 667 N.E.2d 949, 954 (1996) (“Where the language of a contract ... is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.”).
In summary, the '742 patent is not mentioned in any of the three concurrent 2001 agreements although the '742 patent was issued and was known to Vector when these agreements were executed. The '742 patent was not a pending continuation-in-part application, but had issued eight months before the patent transfer contract was entered into. The three agreements specifically list the '553 patent and four United States and foreign applications and describe the technology as me-tallized zinc anodes. No agreement mentions embedded anode technology, the subject matter of the '742 patent. The specification and claims of the '742 patent carefully distinguish the embedded anode technology of the '742 patent from the metallized distributed anode technology of the '553 patent, leaving no ambiguity as to the distinct inventions covered by these patents. It would not have been reasonable to list only the '553 patent if the Patent Assignment were intended to include the '742 patent. No reasonable construction of these contracts can include assignment of the '742 patent by silence.
The Ohio law of contracts views contract interpretation as a matter of law. Potti v. Duramed Pharms., Inc., 938 F.2d 641, 647 (6th Cir.1991) (citing Uebelacker v. Cincom Systems, Inc., 48 Ohio App.3d 268, 549 N.E.2d 1210 (Ohio Ct.App.1988)) (“Under Ohio law, interpretation of written contract terms is a matter of law for initial determination by the court.”). While ambiguous contract terms warrant evidence of contractual intent, ambiguity exists “only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations.” Id. (citing Wells v. Am. Elec. Power Co., 48 Ohio App.3d 95, 548 N.E.2d 995 (1988)); see also Graham, 667 N.E.2d at 954. Here, however, the only reasonable interpretation is that no contract assigned the '742 patent to Vector. See Hercules Inc. v. United States, 292 F.3d 1378, 1381 (Fed.Cir.2002) (“[A] contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.”). There is accordingly no need for fact finding on the question of contractual intent, because the intent of the contracts is clear as a matter of law.
Applying the summary judgment standard of Anderson v. Liberty Lobby, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), I would hold that the '742 patent was not assigned, for no reasonable jury could return a contrary verdict. I would not prolong this litigation.

. This principle is attributed to Sir Humphrey Davy, who in 1824 attached chunks of iron to the hulls of copper-clad ships of the British Navy, and dramatically reduced corrosion of the copper. Euclid Br. at 12 (citing John P. Broomfield, Corrosion of Steel in Concrete: Understanding, Investigation and Repair (Taylor & Francis, 1997)).

. Mr. Whitmore, President of Vector Corrosion Technologies, Inc. and a defendant herein, testified that he knew of the '742 patent in “maybe June or July” following its issuance in April 2001. Whitmore Dep. at 124:18 (Dec. 13, 2006), filed with this court with Letter from Vector’s Counsel (Aug. 6, 2008) to correct a misstatement at oral argument of this appeal.